739 A.2d 507

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Andre STEVENS, Appellant.**

Supreme Court of Pennsylvania.

Submitted Dec. 29, 1998.

Decided Oct. 27, 1999.

Reargument Denied Dec. 30, 1999.

174

Robert Brett Dunham, James Moreno, Philadelphia, for A. Stevens.

Ahmed Aziz, Beaver, Robert S Graci, Harrisburg, for Commonwealth.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

NEWMAN, Justice.

Andre Stevens (Appellant) appeals from the denial of his first petition pursuant to the Post Conviction Relief Act (PCRA).[1] We affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

On direct review of Appellant's two murder convictions, this Court summarized the relevant facts as follows:

> [t]he record reveals that on February 8, 1992, Appellant was in Armando's Bar seated at the end of the bar closest to the entrance. At approximately 1:00 a.m., Brenda Jo Stevens, Appellant's estranged wife, entered the establishment with friends, walked past Appellant and took a seat near the opposite end of the bar. Shortly thereafter, Stevens and [Michael] Love, an acquaintance whom she had met a few months earlier, entered the crowded dance floor and began dancing.

> When he saw them dancing together, Appellant left the bar and went to his car, which was parked across the street. There he retrieved a nine-millimeter semi-automatic pistol loaded with hollow point bullets. Appellant then returned to Armando's and made his way across the dance floor, cocking his gun as he proceeded. As Stevens and Love were leaving the dance floor in different directions, Appellant opened fire on them. He shot his estranged wife twice in the head. Appellant then turned toward Love and fired a series of shots into his body. After a brief pause, Appellant fired a final shot into Love's scrotum area and then calmly left the bar. Love remained in a state of consciousness while first aid was administered to him. However, he later died as a result of the multiple gunshot wounds.

1. 42 Pa.C.S. §§ 9541–9546.

*Commonwealth v. Stevens,* 543 Pa. 204, 208, 670 A.2d 623, 625, *cert. denied,* 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996).

At the guilt phase of his trial, Appellant waived his right to a jury trial and was convicted of two counts of first-degree murder on April 21, 1993. For the penalty phase, Appellant requested a jury, which sentenced him to death on both murder counts. On direct review, we affirmed Appellant's death sentences. *Commonwealth v. Stevens,* 543 Pa. 204, 670 A.2d 623 (1996). On November 6, 1996, Appellant filed a *pro se* PCRA petition. The PCRA court appointed counsel and Appellant filed an amended PCRA petition on March 10, 1997, raising numerous issues. The trial court held hearings on Appellant's petition, limited to two issues: first, whether trial counsel should have conducted additional investigation on mental health issues; second, whether the proportionality review conducted by this Court violated Appellant's Fifth, Sixth, Eighth, and Fourteenth Amendment rights. On April 29, 1998, the trial court denied Appellant's petition. This appeal followed.

## II. *DISCUSSION*

### A. *Trial Counsel's Failure to Develop Mental Health Defense/Mitigation*

From January 26, 1998 until January 29, 1998, the PCRA court conducted hearings on Appellant's claim that trial counsel was ineffective for failing to provide Appellant's mental health experts with documentation relative to Appellant's mental stability at the time of the murders. According to Appellant, this information would have allowed him to present expert testimony to make obvious that he was unable, due to his mental illness, to conform his conduct to the requirements of the law. Appellant also asserts that trial counsel was ineffective, therefore, for: (1) failing to present a diminished capacity defense that would have been available had this information been provided to his mental health experts at the time of his trial; (2) failing to present expert testimony that

would have established a "diminished mental capacity", which would demonstrate a mitigating circumstance pursuant to Section 9711(e)(3);[2] and (3) failing to present expert testimony that would have established mitigating circumstances pursuant to the "catch-all" mitigating factor found at Section 9711(e)(8).[3] Appellant also maintains that, to the extent that trial counsel pursued mental-illness mitigation evidence, he did so ineffectively by failing to develop more detailed expert testimony concerning the nature and extent of Appellant's mental illness. Appellant maintains that he is entitled to a new trial or, alternatively, a new sentencing hearing due to the alleged ineffectiveness of trial counsel.

When a petitioner alleges trial counsel's ineffectiveness in a PCRA petition, he must prove by a preponderance of the evidence that his conviction or sentence resulted from ineffective assistance of counsel "which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii). We have interpreted this provision in the PCRA to mean that the petitioner must show: (1) that his claim of counsel's ineffectiveness has merit; (2) that counsel had no reasonable strategic basis for his action or inaction; and (3) that the error of counsel prejudiced the petitioner—i.e., that there is a reasonable probability that, but for the error of counsel, the outcome of the proceeding would have been different. *See Commonwealth v. Kimball*, 555 Pa. 299, 724 A.2d 326, 333 (1999). We

2. This section provides:
 (e) **Mitigating circumstances**—Mitigating circumstances shall include the following:
 (3) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
 42 Pa.C.S. § 9711(e)(3).

3. This section provides:
 (e) **Mitigating circumstances.**—Mitigating circumstances shall include the following:
 (8) Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of the offense.
 42 Pa.C.S. § 9711(e)(8).

presume that counsel is effective, and it is the burden of Appellant to show otherwise.

The documents and information that form the bases of these ineffective claims concern the mental illness of the Appellant at the time of the murders. First, Appellant points to twenty-two pages of handwritten notes taken from his residence during the execution of a search warrant at the time of his arrest. They can be loosely described as a journal, and were probably written during a period of time before the murders. In his testimony at the PCRA hearing, Dr. Rodney Steven Altman, a board-certified psychiatrist who assisted in the presentation of Appellant's mitigation case, described these notes as "fragmented," "scattered," "disorganized," "rambling," "confused," and "psychotic." Dr. Altman testified that the notes contained symbolism that was indicative of schizophrenic illness, and that the sequence of words and phrases was "perseverative,"[4] which Dr. Altman explained as "where the speech or thought process is stuck in a certain topic or certain word or certain phrase or certain rhyming quality." As an example of the perseverative quality of Appellant's journal, Dr. Altman noted the unrelated grouping of the words "Bill Cosby, Bill Cousins, Bob Babich, Conrail, Bert," in this repetitive, rhyme-type of cadence. Dr. Altman testified that trial counsel did not give him this journal at the time he evaluated Appellant.[5]

---

**4.** Perseveration: continuation of something (as an activity or pursuit) usually to an exceptional degree or beyond a desired point: as **a:** continual repetition of a mental act usually evidenced by speech or by some other form of overt behavior especially as a mechanism of defense **b:** a spontaneous and persistent recurrence of something (as an idea, mental image, tune or word).

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (unabridged).

**5.** A cover letter dated April 5, 1993 from Wayne Lipecky, Appellant's trial counsel, to Dr. Ralph E. Landefeld, a psychologist retained by Dr. Altman to assist in the evaluation of Appellant, was admitted into evidence at the PCRA hearing along with the journal. The cover letter requested that Dr. Landefeld review the journal "to see if you can perhaps make something of it." Dr. Landefeld testified that he had no recollection of having received the cover memo or the 22–page journal. Mr. Lipecky testified that he hand-delivered these materials to Dr.

The next source of information that Appellant contends his trial counsel was ineffective for failing to produce to his mental health experts at the time they evaluated Appellant prior to, and during trial, concerns aspects of Appellant's social and medical history. At the PCRA hearing, Appellant presented the testimony of his older sister, Rosemary Postich, who described two instances where Appellant suffered head injuries as a young child.[6] Ms. Postich explained that Appellant did not walk or talk until rather late in his childhood and that he was a loner. She testified that their father was an alcoholic, and that their mother was a "dramatic" person who, in the children's presence, would threaten to kill herself or to leave the family. Ms. Postich stated that although Appellant's counsel interviewed her for approximately half an hour and she testified at Appellant's trial, counsel never questioned her about Appellant's childhood. Also at the PCRA hearing, Appellant presented the testimony from another older sister, Constance Corbitt, who corroborated much of Ms. Postich's testimony about their childhood family situation, and who also described the changes in Appellant's behavior that occurred during the periods of Appellant's separation from Brenda Jo Stevens, including his heavy drinking, substantial weight loss, and overall depression. Ms. Corbitt further testified that she was never contacted by Appellant's counsel and was not called to testify during the trial, although she was present for some of it. Appellant also presented testimony from his daughter, Karen Mangieri (formerly Karen Stevens), who had testified at the sentencing phase of Appellant's trial. She testified at the PCRA hearing that she had informed counsel of various episodes that indicated Appellant's mental illness, including paranoid suspicions about Brenda Jo Stevens using illegal drugs and abusing their grandchild.[7] Ms. Mangieri testified that counsel did not question her about these episodes during Appellant's trial.

Landefeld's office, but not to Dr. Landefeld personally, on the date of the cover letter.

6. Appellant did not receive medical treatment for these injuries.

7. There was no evidence that Brenda Jo had ever abused their grandchild or had ever used drugs illegally.

The final source of information that Appellant contends his trial counsel was ineffective for failing to produce to his mental health experts are the complete records of psychiatric evaluations conducted while Appellant was in the military in the 1960s. These records indicated that Appellant had been discharged from the service due to his psychological problems, and documented a specific episode where Appellant punched a waitress. Dr. Altman testified that counsel gave him some of Appellant's military records at the time of his initial evaluation, but he had never seen the "majority" of the records introduced at the PCRA hearing.

### 1. *Guilt Phase Ineffectiveness*

Appellant asserts that trial counsel's failure to produce the journal, and failure to provide the mental health experts with more information concerning his social history and past record of mental illness, denied him the ability to present a defense of Guilty But Mentally Ill or, alternatively, a diminished capacity defense, which otherwise would have been available. To support this claim, Appellant presented Dr. Christine Martone, a board-certified psychiatrist who had testified at the penalty phase of Appellant's trial. Dr. Martone had initially examined Appellant in August of 1992 pursuant to the Commonwealth's request to decide whether Appellant would qualify for an insanity defense. Based on that initial interview, Dr. Martone prepared a report in which she diagnosed Appellant as suffering from an adjustment disorder and a personality disorder but concluded that Appellant did not qualify for an insanity defense and did not suffer from a psychotic disorder. After the guilt phase of Appellant's trial was concluded, Appellant's counsel retained Dr. Martone to assist in Appellant's mitigation case. Accordingly, Dr. Martone again examined Appellant in April of 1993, while the penalty phase was ongoing, and subsequently testified to the nature of Appellant's mental illness. During the PCRA hearings, however, Dr. Martone testified that she was not, at the time of her second evaluation of Appellant, provided with Appellant's journal or the other information concerning Appellant's social history. Had those materials been available to Dr. Martone, they would have

affected her earlier diagnoses. According to her testimony at the PCRA hearing, Dr. Martone would have testified at his trial that Appellant would have met the criteria for Guilty But Mentally Ill and that he suffered from a psychosis at the time of the murders.

The trial court denied Appellant's request for a new trial. The court held that the Guilty But Mentally Ill defense is not available in the guilt stage of a capital case, and that there was insufficient testimony to support a diminished capacity defense. We agree. "Guilty But Mentally Ill" is a statutory defense defined at Section 314 of the Criminal Code, and it provides:

> A person who timely offers a defense of insanity in accordance with the Rules of Criminal Procedure may be found "guilty but mentally ill" at trial if the trier of facts finds, beyond a reasonable doubt, that the person is guilty of the offense, was mentally ill at the time of the commission of the offense and was not legally insane at the time of the commission of the offense.

18 Pa.C.S. § 314(a). The statute further defines "mentally ill" as "[o]ne who as a result of mental disease or defect, lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law." 18 Pa.C.S. § 314(c)(1). The "Guilty But Mentally Ill" defense, however, is available in capital cases only in the sentencing phase, and not in the guilt phase. *Commonwealth v. Faulkner*, 528 Pa. 57, 72, 595 A.2d 28, 36 (1991), *cert. denied*, 503 U.S. 989, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992). We explained the rationale for this rule in *Commonwealth v. Young*, 524 Pa. 373, 572 A.2d 1217 (1990):

> In the usual [noncapital] situation the judge is entrusted with determining the appropriate sentence, and the jury's function is confined to determining the guilt of the accused. The verdict providing for "guilty but mentally ill" represents an exception to this general rule. By rendering judgment, the jury is permitted to advise the sentencing judge to consider the fact of mental illness in the exercise of

his sentencing decision. Capital cases are unique in that the jury and not the judge sets the penalty in such cases. The consideration of a possible verdict of guilty but mentally ill is a matter that would appropriately be rendered by a jury in a capital case during the sentencing phase as opposed to the guilty [sic] phase. We permit the jury to rule upon this penological concern during the guilty phase in all other cases simply because they have no opportunity for input in the sentencing phase. That consideration is not present in capital cases.

*Id.* at 393, 572 A.2d at 1227. While "Guilty But Mentally Ill" is not available at the guilt phase of a capital case, the capital sentencing statute permits the introduction of a defendant's history of mental illness as mitigating circumstances in the sentencing phase. We have noted that two sections of the capital sentencing statute allow the jury specifically to consider the defendant's mental health in deciding whether to impose the death penalty: Section 9711(e)(2) (that the defendant was under extreme mental or emotional disturbance), and Section 9711(e)(3) (that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired). *See Faulkner*, 528 Pa. at 73 n. 7, 595 A.2d at 37 n. 7. Accordingly, the trial court correctly held that any testimony by Dr. Martone relating to the "Guilty But Mentally Ill" statute would have had no application in the guilt phase, and correctly held that the assertion of trial counsel's ineffectiveness in this regard had no merit.

The trial court also determined that counsel was not ineffective for failing to pursue a "diminished capacity" defense that Appellant claimed would have been available had the aforementioned materials concerning Appellant's social history and past mental health problems been provided to his mental health experts. Appellant based this claim primarily on the following testimony from Dr. Martone at the PCRA hearing:

Q: This information, had it been provided to you earlier in time than now, that would have affected the conclusions in your first report...?

A: Yes. In terms of the diagnosis I would have diagnosed him as Major Depressive Disorder Psychotic, rule [sic] out Paranoid Disorder or Delusional Disorder Paranoid Type, and I would have considered a guilty but mentally ill verdict—recommendation—then.

Q: Would it have any effect on Mr. Stevens' capacity in terms of diminished capacity?

A: In my opinion a psychotic, this is a question for the jury. I mean, I don't make—but in my opinion when someone is that psychotic they lack the mens rea to form the intent.

Notes of Testimony, 1/28/98, pp. 41–42. The trial court concluded that although this testimony "arguably" may have supported a diminished capacity defense, trial counsel was nevertheless not ineffective for failing to pursue it because, as the trier of fact, the court would not have accepted Appellant's defense in light of the other evidence that established Appellant's premeditation.

 We have described "diminished capacity" as a defense that:

"concedes general criminal liability. The thrust of this doctrine is to challenge the capacity of the actor to possess a particular state of mind required by the legislature for the commission of a certain degree of the crime charged." Thus, in a first-degree murder in which the defendant offers the defense of diminished capacity, he is attempting to prove that he was incapable of forming the specific intent to kill, a requirement of first degree murder.

*Faulkner*, 528 Pa. at 71 n. 4, 595 A.2d at 35 n. 4 (quoting *Commonwealth v. Walzack*, 468 Pa. 210, 220–21, 360 A.2d 914, 919–20 (1976)). We have held that diminished capacity is "an extremely limited defense." *Commonwealth v. Legg*, 551 Pa. 437, 711 A.2d 430, 433 (1998). Evidence that the defendant lacked the ability to control his actions or that he acted impulsively will not establish diminished capacity. *Commonwealth v. Travaglia*, 541 Pa. 108, 124, 661 A.2d 352, 359 (1995),

*cert. denied,* 516 U.S. 1121, 116 S.Ct. 931, 133 L.Ed.2d 858 (1996).

The PCRA court accepted Dr. Martone's testimony at the hearing that she would have testified in support of a diminished capacity defense had (1) Appellant's counsel provided her with the journal and other information regarding Appellant's social history and past mental health problems at the time she examined him for trial, and (2) Appellant retained her for that purpose at the guilt phase of his trial. When questioned regarding his strategy for not pursuing a diminished capacity defense, trial counsel stated that he did not pursue this strategy because, based on Dr. Martone's initial diagnosis that Appellant was not psychotic and not eligible for an insanity-based defense, it did not appear to possess any merit. Appellant argues that reliance on Dr. Martone's initial pretrial examination cannot constitute a reasonable strategic basis for failing to pursue a diminished capacity defense because of counsel's underlying ineffectiveness in failing to obtain a more favorable diagnosis based on the other information of Appellant's social history and past mental health problems allegedly available to Appellant's counsel.

Whether this decision constituted a reasonable strategic decision as we have defined that standard within the test for ineffective assistance of counsel, however, is a determination we need not make if the Appellant cannot show prejudice by counsel's alleged failures. *See Commonwealth v. Pirela,* 556 Pa. 32, 726 A.2d 1026 (1999). Here, the trial court, as the factfinder in Appellant's nonjury trial, concluded that, notwithstanding Dr. Martone's change of diagnosis, it would still have concluded that Appellant had the capacity to form the specific intent to kill at the time of the murders. At Appellant's trial, there was testimony that, on the evening of the murders, Appellant became very angry when he saw Brenda Jo dancing with Love. Appellant slammed his forearms on the bar and stood and stared at Love and Brenda Jo and then left the bar. He retrieved his gun from beneath the seat of his vehicle and returned to the bar. Appellant walked toward the table area, pulled the gun from underneath his jacket, raised it, but then

lowered it to his side and waited until Love and Brenda Jo were finished dancing. When they left the dance floor, Appellant cocked the gun and without hesitation walked up behind Brenda Jo and shot her in the back of the head at close range. He then turned to Love and shot him twice rapidly in succession, and fired at Love several times while he lay on the floor, including an intentional shot through the scrotum area. Appellant fired a last shot at Brenda Jo, hitting her again in the head. Appellant had fired a total of ten shots. Based on this evidence of Appellant's deliberate actions in leaving the bar and returning to shoot his wife and Love multiple times, the trial court concluded that Appellant had formed the specific intent to kill. Notwithstanding Dr. Martone's revised diagnosis of Appellant's psychosis from the trial to the PCRA hearings, the trial court found through circumstantial proof that the Commonwealth had established beyond a reasonable doubt that Appellant had the specific intent to kill, and therefore determined that Appellant suffered no prejudice by pursuit of a defense that would have been unsuccessful had Appellant's counsel presented it. We agree with the finding of the trial court that Appellant has not proved, by a preponderance of the evidence, that there was a reasonable probability that presentation of expert testimony concerning Appellant's psychosis would have successfully prevented the Commonwealth from proving Appellant's premeditation beyond a reasonable doubt.

### 2. *Penalty Phase Ineffectiveness*

█ Appellant's counsel presented testimony from Dr. Altman, Dr. Landefeld, and Dr. Martone concerning Appellant's mental illness as part of his case in mitigation at the sentencing phase. The jury accepted this evidence, and found the Section 9711(e)(2) mitigator—that Appellant had been "under the influence of extreme mental of emotional disturbance." 42 Pa.C.S. § 9711(e)(2).[8] At the PCRA hearing, Appellant ar-

---

8. The trial court instructed the jury on three mitigating circumstances: that the defendant had no significant history of prior criminal convictions (42 Pa.C.S. § 9711(e)(1)); that the defendant was under the influence of extreme mental or emotional disturbance (42 Pa.C.S.

gued that his counsel's alleged failure to provide his experts with available information regarding his social history and earlier mental health problems deprived him of more favorable expert testimony that would have established mitigating circumstances pursuant to Sections 9711(e)(3) and 9711(e)(8). Appellant asserts that there is a reasonable probability that, had counsel adequately prepared the experts and presented this additional mental health testimony, the jury would have found in favor of a life sentence, and therefore Appellant is entitled to a new sentencing hearing.

At the PCRA hearing, Dr. Altman testified that when he evaluated Appellant in 1993, trial counsel had given him only a portion of Appellant's military records and the records of Appellant's commitment at the Community Mental Health Center of Beaver County in 1971. Dr. Altman examined Appellant on March 29, 1993 and April 15, 1993, and prepared a report based on those examinations, his review of the records provided by trial counsel, and a report by Dr. Landefeld of the results of the psychological tests conducted by Dr. Landefeld.[9] In his report, Dr. Altman concluded that Appellant suffered from "a relatively severe personality disorder consisting of paranoia, mood fluctuations, difficulties in judgment as well as rationalized disregard and retribution for and against others." During the sentencing phase of Appellant's trial, Dr. Altman testified to the diagnosis contained in his report, and was questioned about the similarities between Appellant's mental illness as reflected in his military reports and his mental health at the time of the murders. At the PCRA hearing, Dr. Altman testified that, based on the information provided to him in connection with the PCRA proceedings, he believed to a reasonable degree of medical certainty

§ 9711(e)(2)); and the catch-all mitigating factor (42 Pa.C.S. § 9711(e)(8)). In addition to finding that Appellant was acting under the influence of extreme mental or emotional disturbance, the jury also found that Appellant had no significant history of prior criminal convictions.

9. At the PCRA hearing, Dr. Altman stated that when he prepared his April 15, 1993 report, he did not have a written report from Dr. Landefeld, but instead he and Dr. Landefeld had a telephone conversation about the results of Appellant's psychological tests.

that Appellant's ability to conform his conduct to the requirements of law was substantially impaired at the time of the offense.

At the sentencing phase of Appellant's trial, counsel called Dr. Landefeld to testify about the psychological testing of Appellant conducted at Dr. Altman's request. Counsel asked Dr. Landefeld to describe the tests that he administered, and Dr. Landefeld testified that he evaluated Appellant on April 6, 1993 and April 9, 1993, and that he gave Appellant four tests: the Benton Visual Retention Test, a Trail–Making Test, a Rorschach Test, and the Minnesota Multiphasic Personality Inventory. Dr. Landefeld explained that these tests were given as part of a neuropsychological screening inventory to see whether there could be some neurological component to Appellant's mental illness. Appellant's counsel did not question Dr. Landefeld extensively about the results of those tests, and limited his questioning to establishing that Dr. Landefeld reported the results of those tests to Dr. Altman. On cross-examination by the Commonwealth, however, Dr. Landefeld testified that the neuropsychological screening inventory of Appellant gave no "indication of . . . any central nervous system problem." N.T. 4/29/93, p. 9.

In connection with the PCRA proceedings, Appellant was examined by Dr. Carol Armstrong, a neuropsychologist who conducted a neuropsychological testing battery. Dr. Armstrong testified that she administered the neuropsychological testing battery so that she could contribute to Appellant's neurological diagnosis and describe any functional impairments. She explained that neurological screening such as that conducted by Dr. Landefeld was "not very accurate" and that it had the "possibility of missing brain dysfunction if it's in a certain specific region." N.T. 1/27/98, p. 20. She explained that neurological screening should be used to determine whether full neuropsychological testing should be done, and it was inadequate for assessing neurological impairment. The full neuropsychological battery conducted by Dr. Armstrong suggested that Appellant had "right hemisphere brain dysfunction" and that this would influence his ability to control his

mood, emotions, and impulsive responses. According to Dr. Armstrong, if the information regarding Appellant's childhood head injuries, his complete military psychiatric records, Appellant's journal, and additional collateral source information about Appellant's social history had been provided to Dr. Landefeld, then it should have indicated to Dr. Landefeld that a full neuropsychological battery of tests was necessary to determine whether Appellant suffered from any "organic" brain dysfunction. On cross-examination, however, when asked whether it would be reasonable for a general-practitioner psychologist such as Dr. Landefeld to rely on a neuropsychological screening test in his examination of Appellant, Dr. Armstrong responded that "psychologists, clinical psychologists are taught to do that and it's a standard part of their training...." N.T., 1/27/98, p. 81.

At the PCRA hearing, Appellant's PCRA counsel extensively questioned Appellant's trial counsel, Wayne Lipecky,[10] with regard to the strategic basis for his manner of presenting the mental health expert testimony of Dr. Landefeld, Dr. Altman, and Dr. Martone. Lipecky testified that his overall strategy was to keep the mental health testimony consistent and to relate it to Appellant's previous psychological problems as documented in his military psychiatric records and his 1971 commitment to show that Appellant suffered from a lifelong mental illness that had not been properly treated. Lipecky stated that he consulted with Dr. Altman at first in order to determine whether an insanity-based defense would be available to Appellant at the guilt phase of the trial, but abandoned that strategy when Dr. Altman's diagnosis that Appellant did not qualify for an insanity-based defense accorded with Dr. Martone's earlier diagnosis. He also retained Dr. Altman to develop mitigation evidence. Lipecky testified that he met with Dr. Altman on a Sunday afternoon sometime between Dr. Altman's March 29, 1993 and April 15, 1993 examinations of Appellant and reviewed all of the materials in Appellant's file with Dr. Altman. Contrary to the testimony of Dr. Altman at the PCRA hearing, Lipecky testified that he showed the

10. Mr. Lipecky was also Appellant's counsel for his direct appeal.

twenty-two-page journal to Dr. Altman during that Sunday discussion.

Lipecky also testified that he discussed with Dr. Martone in an hour-long telephone conversation the contents of the information he possessed regarding Appellant's delusions concerning his wife's sexual abuse of his daughter and grandchild and his wife's drug use. This conversation took place before her second evaluation of Appellant. Contrary to Dr. Martone's testimony at the PCRA hearing, Lipecky testified that he disclosed all of the relevant background information that he possessed on Appellant's past psychological problems and delusions. He further testified that he relied on the professionalism of the experts for Appellant to diagnose him, and that, at trial, he did not want to develop their diagnoses too specifically so that he would avoid confusing the jury, and cause them to disbelieve the expert testimony. When asked why he did not delve further into the details of his experts' reports or question them regarding each of Appellant's past delusions, Lipecky responded:

> A: I would say that if we started to discuss delusions and hallucinations it could lead to a fudging of his testimony that might cause them to think that there was, where he would start talking about a psychosis when he really didn't find a psychosis and a jury wouldn't believe him or any of the other psychiatrists. . . .
>
> Q: So same thing as to Dr. Martone?
>
> . . .
>
> A: I would suppose so, yeah.
>
> Q: Same thing as to Dr. Altman?
>
> A: Correct.

N.T. 4/29/98, p. 130.

We agree with the trial court that Appellant has failed to prove, by a preponderance of the evidence, that the preparation and presentation by trial counsel of the mental health expert testimony was constitutionally ineffective. Appellant relies on the benefit of hindsight and downplays the diagnoses available to his counsel at the time his case was tried. Coun-

sel testified that he provided Dr. Altman, who was his primary mental health expert, with as much information as he had, including substantial information concerning Appellant's social history and prior mental health problems. He relied on Dr. Altman to present the most favorable mental health mitigation case available, and he attempted to present this and the other expert testimony in a manner that would be understandable to, and believed by, the jury. Indeed, Appellant's counsel succeeded insofar as the jury found the Section 9711(e)(2) mitigator. This is not an instance where counsel failed to present a mental health mitigation case despite the presence of evidence to support such a case. *Compare Commonwealth v. Smith,* 544 Pa. 219, 675 A.2d 1221 (1996), *cert. denied,* 519 U.S. 1153, 117 S.Ct. 1090, 137 L.Ed.2d 223 (1997). Rather, this is a case where a more competent evaluation by the professionals retained by Appellant may have resulted in a more thoroughly developed mental health mitigation case. However, our review of the PCRA hearing indicates that such failures, if any occurred, do not rest at the feet of Appellant's counsel, and that the court properly denied Appellant's claim of trial counsel's ineffectiveness.

### B. *Trial Court's Method of Selecting the Prospective Jurors*

During voir dire on Friday, April 23, 1993, it became apparent to the trial court that there would be an insufficient number of jurors to complete the jury selection process. Accordingly, the trial court issued an order pursuant to Rule 1109 of the Pennsylvania Rules of Criminal Procedure directing the Sheriff to summon thirty persons qualified and competent to serve as jurors.[11] The Sheriff complied with the order of the trial court by issuing a summons to each of thirty

---

11. Rule 1109(a) provides:
 When a sufficient number of qualified jurors are not present to permit selection of a jury, the court shall:
 (a) Require the officials designated by law to summon prospective jurors to summon and return immediately from the county at large as many qualified and competent persons as shall be necessary....
 Pa.R.Crim.P. 1109(a).

individuals at the Beaver Valley Mall on Saturday, April 24, 1993, which required their appearance at the courthouse on Monday, April 26, 1993. Appellant claims that this manner of selecting the jury pool violated his Sixth, Eighth, and Fourteenth Amendment rights because law enforcement officers effectively prescreened the jury pool outside the presence of Appellant or his counsel, and that he was denied a jury that represented a fair cross-section of the community. Appellant alleges that all previous counsel were ineffective in failing to raise this issue on direct appeal and for failing to create a record on this issue.

Although Appellant states that he was denied a jury that represented a fair cross-section of the community, Appellant has failed to create a record to establish even a prima facie claim. To establish a prima facie violation of the requirement that the jury array fairly represent the community, a defendant must show that: (1) the group allegedly excluded is a distinctive group in the community; (2) the representation of this group in the venires from which juries are selected is not fair and reasonable in relation to the number of such people in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process. *Commonwealth v. Craver*, 547 Pa. 17, 28, 688 A.2d 691, 696, *cert. denied*, 522 U.S. 834, 118 S.Ct. 104, 139 L.Ed.2d 58 (1997) (citing *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579, 586–87 (1979)). Appellant does not allege that the summoning of additional prospective jurors from the Beaver Valley Mall resulted in the systematic exclusion of a distinctive group in the community, and, therefore, he does not allege a prima facie claim of denial of a jury that represented a fair cross-section of the community.

Appellant, however, alleges that prior counsel was ineffective for not arguing that the selection of thirty potential jurors by the deputies of the Sheriff at the Beaver Valley Mall without the participation of Appellant or his counsel violated his rights to due process under the Pennsylvania and United States Constitutions because the selection of the prospective

jurors amounted to a "pre-screening" by law enforcement. This claim must fail, as Appellant cannot establish that the method of selecting additional prospective jurors prejudiced him. In *Commonwealth v. Albrecht,* 510 Pa. 603, 511 A.2d 764 (1986), we rejected a similar claim. We held that selecting twenty-nine prospective jurors from local shopping centers by Sheriff's deputies, pursuant to a court order, did not violate the right of the defendant to a jury comprised of a fair cross-section of the community. Here, as in *Albrecht,* Appellant had the opportunity to question all of the additional veniremen in the same fashion as he questioned the original veniremen to see if they were competent, fair, impartial, and unprejudiced. Indeed, Appellant did not exhaust his peremptory challenges during the jury selection process. A review of the voir dire shows that the potential jurors were from different locations in Beaver County and were of different ages and genders. Considering the thorough examination of the prospective jurors during voir dire and the failure of Appellant to allege the selection process systematically excluded any distinctive group, we conclude that the court properly denied Appellant relief on this issue.

## C. *Death/Life Qualified Jurors*

Appellant's third claim of prior counsel's ineffectiveness concerns the disqualification of jurors during voir dire based on those jurors' opinions about the death penalty. Appellant asserts that counsel was ineffective for failing to pursue two instances of alleged trial court error in the jury selection process: first, that the trial court granted a challenge for cause where a prospective juror expressed opposition to the death penalty (i.e., that the trial court improperly "death qualified" the jury); second, that the trial court refused to grant Appellant's challenge for cause to a juror who allegedly held a fixed opinion in favor of the imposition of the death penalty (i.e., that the trial court did not properly "life-qualify" the jury).

In support of his claim that the jury panel was improperly "death qualified," Appellant relies on the decision

of the trial court to grant the challenge of the Commonwealth for cause of one prospective juror following this exchange:

THE COURT: As you know you are being considered as a juror in a case involving the deaths by homicide of Brenda Jo Stevens and Michael Love.... The Defendant is Andre Stevens and the Commonwealth has secured a verdict of guilty of murder of the first degree with respect to both of those deaths. It is now up to a jury to determine whether to impose the penalty of death or the penalty of life imprisonment upon Mr. Stevens. Do you have an opinion about the death penalty which would prevent you from following the Court's instructions as to what penalty should be imposed?

A: I don't believe in the death penalty.

N.T., 4/22/93, p. 161. Trial counsel posed no objection to the decision of the court to strike this juror for cause. Appellant presently maintains that counsel was ineffective for not rehabilitating this juror by questioning her whether she would be able to follow the instructions of the trial court in deciding what sentence to impose and for not objecting when the trial court removed this potential juror for cause solely because she expressed an opposition to the death penalty.

It is well settled that a prospective juror may be excluded for cause when his or her views on capital punishment are such as would prevent or substantially impair the performance of his or her duties as a juror in accordance with his or her instructions and his or her oath. *Commonwealth v. Holland,* 518 Pa. 405, 416, 543 A.2d 1068, 1073 (1988). When the prosecutor seeks to remove a juror because that juror expresses views against the death penalty that prevent the juror from following the instructions of the court, we refer to this as "death-qualification." *See Commonwealth v. Morris,* 546 Pa. 296, 301 n. 2, 684 A.2d 1037, 1040 n. 2 (1996), *cert. denied,* 521 U.S. 1106, 117 S.Ct. 2484, 138 L.Ed.2d 992 (1997). Appellant argues that trial counsel was ineffective for failing to object to the trial court's striking of this juror for cause where there was insufficient testimony concerning whether

she would be able to apply the court's instructions regardless of her anti-death penalty views. We disagree.

The decision whether to disqualify a juror is within the sound discretion of the trial court and will not be reversed in the absence of a palpable abuse of discretion. *Commonwealth v. Colson,* 507 Pa. 440, 454, 490 A.2d 811, 818 (1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986). The trial court makes that determination based on the prospective juror's answers to questions and demeanor. *Id.* Here, the remainder of the voir dire indicates that the trial court did not deny counsel the opportunity to question the veniremen or to attempt to rehabilitate the prospective jurors if counsel chose to do so, and specifically directed Appellant's counsel to object if he thought the trial court's granting of the challenge for cause was improper. Our review of the voir dire indicates that with most other jurors, except where the cause for striking the juror was immediately clear, the court inquired as to whether that juror would be able to set aside his or her personal opinion of the death penalty and follow the instructions of the court. We accept the statement of the trial court in its opinion when it stated that its decision not to conduct further inquiry with respect to this juror was based on its assessment of her demeanor in responding to the question. Accordingly, we find no merit to Appellant's claim that counsel was ineffective for not objecting to the "death qualification" of the jury.

Appellant also asserts that trial counsel was ineffective for not properly "life qualifying" the jury by failing to object to the refusal of the trial court to strike for cause a juror who expressed support for the death penalty. The purpose of "life qualifying" the jury is to ask questions on voir dire that identify prospective jurors who would be unable to consider a sentence of life imprisonment. *Commonwealth v. Morris,* 546 Pa. 296, 307, 684 A.2d 1037, 1043 (1996). Because the prosecutor, through his or her "death qualifying" questions, is allowed to determine that a juror is capable of sentencing the defendant to death in appropriate circum-

stances, due process requires that the defendant also be permitted to question prospective jurors to disqualify those who would be incapable of imposing a life sentence regardless of the instructions of the court. *See Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). While the court cannot deny the defendant the opportunity to life-qualify the jury, there is no requirement that counsel ask life-qualifying questions. *Commonwealth v. Lark,* 548 Pa. 441, 451, 698 A.2d 43, 48 (1997).

Here, Appellant argues that the refusal of the trial court to grant his challenge for cause of another prospective juror was erroneous, and that counsel was ineffective for not pursuing this on appeal. In response to the question, "Do you have an opinion about the death penalty which would prevent you from following the Court's instructions as to what penalty should be imposed," this juror replied, "I believe in the death penalty. But whatever, I would go by the instructions, whatever the Court—." N.T., 4/22/93, p. 63. She also stated that she would be more likely to believe a police witness than a defense witness but that she would set aside that view and follow the court's instructions. Counsel objected to the refusal of the court to strike this juror for cause, and exercised a peremptory challenge. We find Appellant's claim that counsel was ineffective for not pursuing this matter on appeal is without merit. The record amply demonstrates that this juror testified that she could set aside her views concerning the death penalty and the credibility of police witnesses and follow the instructions of the court. Accordingly, the decision of the court to deny the challenge for cause was proper, and we will not find counsel ineffective for failing to pursue a claim that has no merit.

### D. *Introduction of Prejudicial Evidence at Penalty Phase*

As his fourth assertion of his prior counsel's ineffectiveness, Appellant claims that counsel was ineffective for failing to object to the introduction at the sentencing proceedings of allegedly prejudicial evidence concerning the relationships of Appellant with other women during his marriage.

During the penalty phase, the Commonwealth elicited testimony from four witnesses who testified that on occasion Appellant had dated other women during the periods of separation from his wife, and that Appellant had been seen dancing with other women. The Commonwealth offered this testimony to rebut Appellant's explanation that he had shot his wife when he witnessed her dancing with Love.

As with all claims of ineffectiveness of counsel, Appellant must show that counsel's alleged failure to raise this issue prejudiced him. We find no prejudice to Appellant with regard to this issue. Contrary to Appellant's assertion, the Commonwealth did not attempt to present to the jury a nonstatutory aggravating factor by arguing the infidelity of Appellant was a reason to impose the death penalty. Instead, the Commonwealth's relatively infrequent introduction of testimony about Appellant's involvement with other women was to counteract any sympathy that Appellant sought to generate through the testimony that he introduced that he shot his wife because he saw her dancing with another man. Because of the Commonwealth's limited use of this testimony, we cannot find that there is a reasonable probability that, had this evidence been excluded, the outcome of the proceedings would have been different. Accordingly, we deny this ineffectiveness claim.

### E. *Erroneous Jury Instructions*

#### 1. *Torture*

Appellant claims ineffectiveness of counsel for failing to challenge the trial court's instruction regarding the aggravating factor of torture [12] on grounds that the instruction was unconstitutionally vague and that this Court's limiting construction of that aggravating factor fails to cure the deficiency. The instruction of the trial court regarding torture was as follows:

Now in proving death committed by means of torture as an aggravating circumstance, the Legislature did not intend to

12. 42 Pa.C.S. § 9711(d)(8).

limit means of torture to those used in the Middle Ages or in some horror movies that somebody may have seen such as a rack or boiling in oil. For a person to commit murder by means of torture under this aggravating circumstance he must intend to inflict a considerable amount of pain or suffering and must do so in a manner or by means that are unnecessarily heinous or atrocious or cruel and show exceptional depravity. Implicit in this definition of torture is the concept that the pain or suffering was unnecessary or more than needed to effectuate the death of the victim. The intent to inflict a considerable amount of pain or suffering may be inferred from the circumstances. Neither the efficacy of the means employed by the defendant to murder the victim of the immediacy of death is in itself a determinant, although in the question of whether the offense was committed by means of torture, it does not matter [sic] a victim may not have actually suffered pain due to loss of consciousness, for example, in determining whether the defendant had the intent to inflict a considerable amount of pain. A defendant's ability to achieve a particular result does not negate the possibility that he intended to bring about the result.

N.T., 4/29/93, pp. 65–66.

On direct appeal, we found that there was sufficient evidence to support the jury's finding of the aggravating factor of torture because the number and placement of shots into Love's body, especially the final shot into Love's scrotum, and the fact that Love remained conscious for a long period of time before he died, demonstrated Appellant's intent to inflict considerable pain and suffering. *Commonwealth v. Stevens,* 543 Pa. 204, 215, 670 A.2d 623, 628 (1996). We stated that in order for the Commonwealth to substantiate the aggravating circumstance of torture beyond a reasonable doubt, it must be demonstrated that Appellant possessed an intent, separate from the intent to kill, to inflict a considerable amount of pain and suffering that was unnecessarily heinous, atrocious, or cruel, manifesting exceptional depravity. *Id.* at 214, 670 A.2d at 628 (citations omitted). The instruction of the trial court in

this case adequately explained what the jury must find in order to apply the aggravating circumstance of torture, and counsel is not ineffective for failing to pursue a meritless challenge to the sufficiency of the trial court's instruction.

Moreover, Appellant's contention that former counsel was ineffective for failing to raise a claim that this Court's construction of the aggravating circumstance of torture is unconstitutionally vague is without merit. The test promulgated by the United States Supreme Court for determining whether a statutory aggravator is unconstitutionally vague is: (1) whether the statutory language is vague on its face; (2) if vague on its face, have the appellate courts given further definition to the vague term; and (3) is the definition given by the appellate courts constitutionally sufficient. *Walton v. Arizona*, 497 U.S. 639, 654, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990). In *Commonwealth v. Nelson*, 514 Pa. 262, 278, 523 A.2d 728, 737, *cert. denied*, 484 U.S. 928, 108 S.Ct. 293, 98 L.Ed.2d 253 (1987), we noted that the test to decide if a statutory aggravator is unconstitutionally vague is "whether the prohibited conduct is so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." We held that the term "torture" is generally understood as "the infliction of a considerable amount of pain and suffering on a victim which is unnecessarily heinous, atrocious, or cruel manifesting exceptional depravity." *Nelson*, 514 Pa. at 279, 523 A.2d at 737, *quoting Commonwealth v. Pursell*, 508 Pa. 212, 239, 495 A.2d 183, 196 (1985). While we concluded in *Nelson* that "the word 'torture,' even with its ductile quality, does not present a vagueness question of constitutional proportions," we held that further refinement of the term was necessary in order to channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance that make the process for imposing a sentence of death rationally reviewable. *Nelson*, 514 Pa. at 279, 523 A.2d at 737 (citing *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 1764–65, 64 L.Ed.2d 398 (1980)). Accordingly, we developed the rule, which is applied here and in all capital cases involving the aggravating factor of torture, that the Commonwealth must

show beyond a reasonable doubt that the defendant possessed an intent, separate from the intent to kill, to inflict a considerable amount of pain or suffering that was unnecessarily heinous, atrocious, or cruel. *See, e.g., Commonwealth v. Stevens,* 543 Pa. 204, 214, 670 A.2d 623, 628 (1996). This refinement of the definition of the "torture" aggravating circumstance comports with the requirements of *Walton* and is not unconstitutionally vague, and we will not deem counsel ineffective for failing to pursue this issue that has no merit.

### 2. *Grave Risk of Death to Another*

The next claim of error concerns the failure of prior counsel to challenge the instruction of the trial court regarding the aggravating circumstance of knowingly creating a grave risk of death to another person in addition to the victim of the offense. *See* 42 Pa.C.S. § 9711(d)(7). The trial court's instruction on this aggravating factor was as follows:

First, in the commission of the offense, the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense. A person knowingly creates a grave risk of death to another person in addition to the victim of the offense if he's aware that his conduct is of that nature or that such circumstances exist. Therefore, in deliberating on this aggravating circumstance you should consider all of the evidence concerning the defendant's conduct at the time of the shooting and the attendant circumstances including the number of people in the bar at the time of the shooting, their relative location and proximity with reference to the defendant at the time of the shooting, the number and direction of shots fired, the danger of ricocheted bullets, whether or not the defendant pointed the gun at another person or persons, evidence of the spent bullets in the bar stool, evidence of a hole in the coat of one of the patrons and whether or not that hole was caused by a bullet and evidence of fragments found and their location in the area of the bar.

N.T. 4/29/93, pp. 63–64.

Appellant asserts that former counsel was ineffective for failing to challenge this statutory factor as unconstitutionally

vague and for failing to challenge the trial's court's instruction, which Appellant claims did not narrow the deliberations of the jury in accordance with our previous construction of this aggravating circumstance. The first argument is without foundation, and we have already determined that the Section 9711(d)(7) aggravating factor is not unconstitutionally vague on its face. *See Commonwealth v. Smith*, 518 Pa. 15, 45, 540 A.2d 246, 261 (1988) (citing *Gregg v. Georgia*, 428 U.S. 153, 203–04, 96 S.Ct. 2909, 2939, 49 L.Ed.2d 859 (1976)); *Proffitt v. Florida*, 428 U.S. 242, 256, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913 (1976). We also do not find that the instruction of the trial court failed to limit the consideration of the jury pertaining to what must be proven in order for this aggravating factor to apply. Appellant relies on *Commonwealth v. Stokes*, 532 Pa. 242, 615 A.2d 704 (1992), where we found that the trial court improperly instructed the jury, in a triple-murder case, that the risk of death to the other two victims could be considered as evidence of the Section 9711(d)(7) aggravator for the murder of the first victim. We stated that the "aggravating circumstance at issue applies to situations where the defendant in the course of killing his particular victim acts in a manner which endangers the lives of others close in proximity to the intended or actual victim." *Id.* at 260, 615 A.2d at 713. Here, unlike the defective instruction in *Stokes*, the trial court did not impermissibly refer to the killing of the second victim as grounds for finding this aggravator in the killing of the first victim.[13] As the instruction demonstrates, the trial court properly instructed the jury that they could consider the risk of death to the other patrons of the bar in finding the Section

13. Appellant claims that because the trial court, in giving the Section 9711(d)(7) instruction to the jury concerning the murder of Michael Love, referred to the instruction as "the same as the first one in connection with the victim, Brenda Jo Stevens," and did not repeat the instruction, the court may have lead the jury to believe that the murder of Brenda Jo Stevens counted towards this aggravator. We disagree. We believe that the trial court's reference to its earlier, very detailed instruction about what facts and circumstances the jury could consider in finding this aggravator was sufficiently clear and did not mislead the jury into believing that the murder of Brenda Jo Stevens could be considered in finding this aggravator for the murder of Michael Love.

9711(d)(7) aggravator. Counsel was not ineffective for not pursuing this claim without merit.

### 3. *Double Counting of Same Aggravation Evidence*

■ Appellant avers that former counsel was ineffective for not challenging the instructions of the trial court to the jury on the grounds that the cumulative effect of these instructions was to cause the jury to believe that the same predicate facts could serve as the basis for finding the Section 9711(d)(7) (grave risk of death to another) and Section 9711(d)(11) (conviction of another murder) aggravating factors. We disagree. As discussed above, the instructions of the trial court regarding the Section 9711(d)(7) aggravator were proper and did not mislead the jury to believe that the death of either victim could be considered in establishing this aggravator for the murder of the other victim. Instead, the trial court properly explained to the jury that the murder of one victim could establish the Section 9711(d)(11) aggravating factor for the murder of the other victim when it instructed:

> The second aggravating circumstance with regard to the death of Brenda Jo Stevens is as follows: the defendant has been convicted of another murder committed either before or at the time of the offense at issue. In your deliberations on this aggravating circumstance you should understand that the word convicted as used in that circumstance means found guilty. It does not require that the defendant has also been sentenced. This aggravating circumstance, therefore, includes a double murder and only requires that the defendant has been found guilty of another murder committed either before or at the time of the offense at issue.

N.T., 4/29/93 at pp. 64–65. With respect to the Section 9711(d)(11) aggravator for the murder of Michael Love, the trial court stated that "[t]he second [aggravator] is that the defendant has been convicted of another murder committed either before or at the time of the offense at issue. And again, I won't give you the supplemental instruction with regard to

this aggravated assault [sic] circumstance." N.T., 4/29/93 at p. 65.[14]

The instructions of the trial court did not result in the double counting of the same factual predicate to establish two aggravating circumstances. As discussed above, the trial court's instructions on the Section 9711(d)(7) aggravator directed the jury to the grave risk of death posed by Appellant's firing of a pistol in a bar where other patrons were present and in close proximity, and did not suggest that the murder of the other victim could count towards this aggravator. Further, the instructions of the trial court on the Section 9711(d)(11) aggravator properly informed the jury that the murder of Brenda Jo Stevens could count as an aggravating circumstance in the murder of Michael Love, and vice-versa. We conclude that counsel was not ineffective for failing to raise this issue that has no merit.

### 4. *Reasonable Doubt*

Appellant claims that previous counsel was ineffective for not challenging the alleged failure of the trial court to instruct the jury that the Commonwealth must prove each element of each aggravating circumstance beyond a reasonable doubt. Following the conclusion of testimony at the penalty phase, the trial court instructed the jury:

> The Commonwealth must prove any aggravating circumstance beyond a reasonable doubt. This does not mean that the Commonwealth must prove the aggravating circumstance beyond all doubt and to a mathematical certainty. A reasonable doubt is the kind of doubt that would cause a reasonable and sensible person to hesitate before acting upon an important matter in his own affairs. A reasonable

14. This instruction came after the trial court's instruction on the Section 9711(d)(7) aggravator for the murder of Michael Love, *see* footnote 13, *supra,* where the court referred the jury to the instruction it had given for that aggravator for the murder of Brenda Jo Stevens. While the court did not explicitly refer to the instruction for the double murder aggravator that it gave for the murder of Brenda Jo Stevens, it is clear from the instructions as a whole that the trial court, when instructing the jury on the double murder aggravator for the killing of Michael Love, was referring to that earlier instruction.

doubt must fairly arise out of the evidence that was presented or out of the lack of evidence which was presented with respect to some elements of the aggravating circumstance.
N.T., 4/29/93, pp. 62–63.

This instruction properly informed the jury of the standard for finding reasonable doubt and complied with the Pennsylvania Criminal Suggested Standard Jury Instruction 15.2502F(2). Moreover, the last sentence of this instruction directed the jury that they could have a reasonable doubt if the Commonwealth failed to produce sufficient evidence with respect to "some" elements of the aggravating circumstance. While Appellant contends that this instruction could mislead the jury into believing that they had to find insufficient evidence for more than one element of an aggravating circumstance in order to have a reasonable doubt, whereas a lack of evidence regarding *one* element of an aggravating circumstance would be sufficient to hold a reasonable doubt, Appellant fails to demonstrate prejudice from the instruction of the trial court. Appellant does not show how the absence of a specific reference to "one" or "any" element of an aggravating circumstance in this instruction caused unreliable death sentences, particularly in light of our conclusion, both on direct review and in this appeal, that there was sufficient evidence to support the aggravating circumstances found by the jury. Without such a demonstration of prejudice, Appellant cannot prevail on a claim of ineffective assistance of counsel. *Commonwealth v. Kimball,* 555 Pa. 299, 724 A.2d 326 (1999).

### 5. *Mitigating Factors*

Appellant claims that previous counsel was ineffective for not challenging the instruction of the trial court concerning the purpose of aggravating and mitigating circumstances in capital cases. Specifically, Appellant complains that the following portion of the instruction of the trial court interfered with the determination of the jury of Appellant's personal moral culpability for these murders: "[t]he Sentencing Code defines aggravating and mitigating circumstances. There [sic] are things that make a first degree murder case either more

terrible or less terrible." N.T., 4/29/93, p. 62. According to Appellant, the use of the word "terrible," in conjunction with the use of the word "case," improperly distracted the jury from consideration of Appellant's mitigation evidence by drawing their attention to a generalized conception of the "case."

When reviewing a challenge to a part of a jury instruction, an appellate court must review the jury charge as a whole to determine if it is fair and complete. *Commonwealth v. Jones*, 542 Pa. 464, 517, 668 A.2d 491, 517 (1995), *cert. denied*, 519 U.S. 826, 117 S.Ct. 89, 136 L.Ed.2d 45 (1996) (citing *Commonwealth v. Saunders*, 529 Pa. 140, 602 A.2d 816 (1992)). A trial court has broad discretion in phrasing its charge and can choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. *Id.* Appellant ignores an earlier instruction by the trial court regarding the function of aggravating and mitigating circumstances, where the court stated:

> Now, the sentence that you impose will depend on whether you find any of the things that the Pennsylvania Sentencing Code calls aggravating or mitigating circumstances. Loosely speaking, aggravating circumstances are things about the killing and the killer which make a first degree murder case more terrible and deserving of the death penalty, while mitigating circumstances are those things which make the case less terrible and less deserving of the death penalty.

N.T., 4/26/93, pp. 4–5. We do not find that the instructions of the trial court, as a whole, interfered with the jury's evaluation of the specific mitigation evidence presented by Appellant or their assessment of his personal moral culpability. These instructions merely expressed to the jury, in laymen's terms, the purpose for the distinction between aggravating and mitigating circumstances in a capital penalty phase. Appellant does not challenge the propriety of the instructions of the trial court concerning the mitigating circumstances offered by Appellant, and we have found that the instructions of the trial court on the aggravating circumstances were proper. Therefore, Appellant's claim that the instructions of the trial court interfered with the jury's evaluation of his mitigation evidence

is without merit, and we do not find counsel ineffective for not pursuing this issue.

### 6. *"Life Means Life" Instruction*

Appellant in his next assertion of error, claims that prior counsel was ineffective for not claiming, pursuant to *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), that the trial court erred in failing to instruct the jury that a life sentence means life without the possibility of parole. *Simmons* requires an instruction that "life" means life without the possibility of parole only when the prosecutor injects concerns of the defendant's future dangerousness into the proceedings. *Commonwealth v. Gibson,* 547 Pa. 71, 105, 688 A.2d 1152, 1169, *cert. denied,* 522 U.S. 948, 118 S.Ct. 364, 139 L.Ed.2d 284 (1997). At the time of the trial of Appellant in 1993, however, *Simmons* had not been decided, and the law in Pennsylvania prohibited juries from being informed that "life" means life without parole. *Commonwealth v. Speight,* 544 Pa. 451, 469, 677 A.2d 317, 326 (1996), *cert. denied,* 519 U.S. 1119, 117 S.Ct. 967, 136 L.Ed.2d 852 (1997) (citing *Commonwealth v. Christy,* 540 Pa. 192, 217, 656 A.2d 877, 889, *cert. denied,* 516 U.S. 872, 116 S.Ct. 194, 133 L.Ed.2d 130 (1995)). Counsel for Appellant did not request a "life means life" instruction, nor did Appellant pursue this issue as a claim of trial court error or ineffective assistance of counsel on direct appeal. Where a defendant raises a *Simmons* claim in collateral proceedings, we have held that there is no entitlement to relief because we have refused to give *Simmons* retroactive effect. *Commonwealth v. Abu–Jamal,* 553 Pa. 485, 720 A.2d 79, 120 (1998). Consequently, Appellant's claim must fail.

### F. *Introduction of Evidence Not Related to Aggravating Factor*

Appellant contends that counsel was ineffective for failing to challenge the admissibility of certain evidence which, he claims, the Commonwealth improperly introduced to establish aggravating circumstances not related to any statutory ag-

gravating factor. First, Appellant contends that the Commonwealth's question to Dr. Martone concerning his dangerousness to others improperly placed an issue of his future dangerous before the jury. Second, the Commonwealth's commentary on Appellant's lack of remorse allowed the jury to consider his "silence" against him in the penalty stage. Finally, Appellant argues that the Commonwealth introduced victim impact testimony when, during cross-examination of Appellant's daughter, Karen Stevens, the prosecutor asked her if she had had a good relationship with her mother and whether she missed her mother.

The record does not support Appellant's claim that the Commonwealth improperly argued his future dangerousness to the jury. During the cross-examination of Dr. Martone, the prosecutor asked, in the midst of a series of questions designed to test the basis of Dr. Martone's testimony regarding Appellant's mental condition, "[t]o a reasonable degree of medical certainty in your expert opinion can you determine if he's dangerous?" N.T., 4/28/93, p. 67. Dr. Martone's responded, "[i]n my opinion he would only be dangerous to certain people. He is not somebody that at random would hurt people." *Id.* During closing argument, the prosecutor summarized the testimony from the mental health experts of Appellant to undermine his mitigation case. The prosecutor noted that Dr. Martone had testified that Appellant was not insane and knew the difference between right and wrong. The prosecutor then stated:

> What does that mean? It means that when he [Appellant] walked in the bar on February 8[th] he had the mental ability to choose doing something other than what he did. He can conform his behavior to normal societal standards. He can walk out the door. "Doctor Martone, is he dangerous?" "No, just to his spouse."

N.T., 4/29/93, p. 20. Contrary to Appellant's contention, the prosecutor was not arguing Appellant's future dangerousness, but instead relied on Dr. Martone's testimony that Appellant was not dangerous to show that Appellant's mental illness did

not drive his behavior. Accordingly, this claim is without merit.

■ Likewise, Appellant's assertion that the Commonwealth improperly referred to his lack of remorse is without merit. Because Appellant testified at the sentencing phase, his claim that the Commonwealth cannot argue that he showed a lack of remorse during that testimony is absurd. *Cf. Commonwealth v. Holland*, 518 Pa. 405, 543 A.2d 1068 (1988) (where capital defendant did not testify at sentencing hearing, prosecutor's comment on defendant's failure to show remorse was not error).

■ Appellant's assertion that the Commonwealth improperly introduced victim impact testimony belies the purpose of the Commonwealth in its cross-examination of Karen Stevens. Appellant had Karen Stevens testify during the mitigation case primarily so that she could testify that, although Appellant murdered her mother, she did not want her father to be executed. During the cross-examination of Ms. Stevens, the prosecutor asked her numerous questions to show that Appellant's mental illness did not affect his ability to appreciate the nature of his actions or impair his ability to plan the murder of his wife. Ms. Stevens apparently became upset while on the witness stand, and the following exchange occurred:

Q: Did you have a good relationship with your mother, Karen?

A: Yes, I did.

Q: Do you miss your mother?

A: Yes, I do. I miss her a lot.

Q: I know. Karen, I know it's tough. Keep your voice up. Did your father tell you he was going to kill your mother?

A: He only said one time. It was about a week before everything happened, that when I went over there, he said that—he was talking and rambling like he did, and he said that he couldn't believe he didn't go up and shoot her yet, and that's the only time he ever had said anything.

N.T., 4/29/93, p. 12–13. This questioning, while designed to calm an emotionally distressed witness during difficult cross-

examination, did elicit testimony regarding the impact of the murder on the victim's daughter.

In *Commonwealth v. Fisher*, 545 Pa. 233, 681 A.2d 130 (1996), we held that the version of the capital sentencing statute then in effect did not permit the introduction of victim impact testimony. *Fisher*, however, is distinguishable. In *Fisher*, the Commonwealth presented testimony to establish the impact that the murder had on the family of the victim, and requested and received, over trial counsel's objection, a jury instruction on the use of that testimony. *Fisher*, 545 Pa. at 269–70, 681 A.2d at 147–48. Here, by contrast, the Commonwealth, during cross-examination directed towards other purposes, indirectly questioned the victim's daughter about whether she missed her mother. Furthermore, the Commonwealth requested no jury instruction to focus the jury on Ms. Stevens' testimony, and did not argue "victim impact" during its closing. Likewise, *Commonwealth v. McNeil*, 545 Pa. 42, 679 A.2d 1253 (1996), *cert. denied*, 523 U.S. 1010, 118 S.Ct. 1198, 140 L.Ed.2d 327 (1998), is distinguishable. In *McNeil*, the Commonwealth presented a witness to testify to the character of the victim. Here, the Commonwealth made only a passing reference to the victim's relationship with her daughter during cross-examination. Consequently, we cannot find that Appellant suffered any prejudice from his counsel's failure to object to this testimony.

### G. *Constitutionality of Proportionality Review*

In his next assertion of error, Appellant argues that the proportionality review conducted by this Court on direct appeal [15] denied him due process because we allegedly do not conduct "meaningful" appellate review. We have repeatedly rejected claims that our comparative proportionality review process is constitutionally defective. *See, e.g., Commonwealth*

---

**15.** In 1997, the legislature abolished the comparative proportionality review formerly required by 42 Pa.C.S. § 9711(h)(3)(iii). We have held, however, that for direct review of all cases in which sentence was imposed prior to the effective date of this amendment, we continue to conduct comparative proportionality review. *See Commonwealth v. Gribble*, 550 Pa. 62, 703 A.2d 426 (1997).

*v. Porter,* 556 Pa. 301, 728 A.2d 890, (Pa. 1999); *Commonwealth v. Gribble,* 550 Pa. 62, 703 A.2d 426 (1997), *cert. denied,* —— U.S. ——, 119 S.Ct. 519, 142 L.Ed.2d 430 (1998). As we stated in *Gribble:*

> [W]e examine not only the compiled data from the AOPC [Administrative Office of the Pennsylvania Courts], but we also have at our disposal the verdict sheets and the review forms submitted by the President Judges. This allows us to conduct a thorough review of cases similar to the one in question and provides additional screening for any anomalies that may be present in the AOPC database. We have carefully reviewed these procedures and find nothing arbitrary or capricious in this scheme. Instead, we believe that our proportionality review comports with the General Assembly's desire to afford capital defendants an additional check against the arbitrary imposition of the death penalty.

*Gribble,* 550 Pa. at 91–92, 703 A.2d at 441. Accordingly, we reject Appellant's claim regarding the sufficiency of our system for comparative proportionality review.

## H. *Presentation of Forensic Evidence*

Appellant disputes and says that his former counsel was ineffective in failing to challenge the trial court's admission of testimony from the pathologist, Dr. James Smith, concerning the manner of Brenda Jo Stevens' death. On direct appeal, Appellant challenged the introduction of Dr. Smith's testimony regarding his autopsy of Michael Love on the grounds that this evidence was relevant only for the guilt phase of his trial, and that it had a prejudicial impact when introduced in the sentencing phase. *Commonwealth v. Stevens,* 543 Pa. 204, 213, 670 A.2d 623, 627 (1996). We denied this claim, holding that "[t]he pathologist's testimony was used in support of the aggravating circumstances of torture and creating a grave risk of death to others." *Id.* We further held that "[t]his evidence clearly formed the history and natural development of the events for which Appellant was being sentenced." *Id.* Presently, Appellant raises a similar claim with respect to the introduction of forensic testimony regard-

ing the manner of death of Brenda Jo Stevens. We reject this claim. The Commonwealth had the burden of proving beyond a reasonable doubt the existence of the statutory aggravator of Section 9711(d)(11): that the Appellant had committed a double murder. 42 Pa.C.S. § 9711(d)(11). This testimony was relevant both to explain to the jury the history and natural development of the case and to prove the double murder aggravator. Appellant's ineffectiveness claim therefore lacks merit.

## I. *Cumulative Error*

Appellant, in his final claim, asserts that the cumulative effect of the errors of the trial court deprived him of his constitutional rights. In view of the fact that we have found no support for Appellant's individual assertions of error, we deny this unfounded claim of cumulative trial court error.

## III. *CONCLUSION*

For the foregoing reasons, we affirm the Order of the trial court and deny the petition of Appellant for post-conviction relief.[16]

Justice ZAPPALA and Justice NIGRO file dissenting opinions.

ZAPPALA, Justice, dissenting.

I respectfully disagree with the majority's conclusion that Appellant was not prejudiced by his trial counsel's failure to pursue a defense of diminished capacity during the guilt phase of his trial.

According to the majority, "the trial court found through circumstantial proof that the Commonwealth had established beyond a reasonable doubt that Appellant had the specific

16. Pursuant to 42 Pa.C.S. § 9711(i), the Prothonotary of the Supreme Court is directed to transmit to the Governor a full and complete record of the trial, sentencing hearing, imposition and review, and to give notice to the Secretary of Corrections contemporaneously with this transmission.

intent to kill, and therefore determined that Appellant suffered no prejudice by pursuit of a defense that would have been unsuccessful had Appellant's counsel presented it." (Majority Op. at 516). This implies that anytime the Commonwealth has established the elements of a crime then the defendant's criminal liability is unassailable. The majority's sweeping conclusion calls into question the existence of affirmative defenses and diminishes the role of defense counsel.

Counsel may be ineffective where the defense of diminished capacity is available, reasonable investigation would have made counsel aware of the availability of the defense, and the defense does not conflict with other trial strategies. See *Commonwealth v. Legg*, 551 Pa. 437, 711 A.2d 430 (1998). Furthermore, counsel may also be ineffective where pursuit of a possible defense was curtailed by the lack of reasonable investigation. See *Commonwealth v. Mabie*, 467 Pa. 464, 359 A.2d 369 (1976).

Appellant's contention is that his counsel failed to provide relevant materials to Dr. Martone and that the absence of these materials, especially the writings that comprised Appellant's journal, led to Dr. Martone's initial misdiagnosis of Appellant. It was this misdiagnosis which Appellant's counsel relied upon in not pursuing a diminished capacity defense. This meant that no further psychiatric examinations were made, no witnesses were interviewed, and no trial strategy was devised regarding the diminished capacity defense.

The PCRA court determined that Appellant suffered no prejudice by his counsel's failure to pursue this defense. It held that it would have found that Appellant had, and exhibited, the specific intent to kill despite Dr. Martone's revised diagnosis as presented at the PCRA hearing. I believe that the PCRA court as well as the majority fails to consider the full effect of counsel's error in failing to provide the documents needed to correctly diagnose Appellant. Rather, their consideration is limited to whether Dr. Martone's testimony during the PCRA hearing would have been sufficient to establish reasonable doubt when set against the evidence offered by the Commonwealth at trial. This may have indeed been the

proper analysis had Appellant presented Dr. Martone's revised diagnosis as after-discovered evidence. However, Dr. Martone's revised diagnosis, set against her testimony at trial, is offered to show counsel's ineffectiveness in failing to pursue a vigorous and viable defense. Counsel's failures precluded not only Dr. Martone's correct testimony at trial, but also any other evidence, which was not discovered due to counsel's failure. Since it is impossible for the trier of fact to fully anticipate and properly weigh a defense that was never prepared and never presented, it is impossible for the PCRA court to state that Appellant was not prejudiced by such failure.

I dissent, as I would remand to the PCRA court to reconsider Appellant's claim that counsel could have developed a viable diminished capacity defense had counsel provided Dr. Martone with the proper materials to obtain a correct diagnosis in the first instance.

NIGRO, Justice, dissenting.

Based on the narrow set of circumstances presented in this case, I agree with Justice Zappala that the matter should be remanded to the PCRA court for reconsideration of Appellant's claim that his counsel could have developed a viable diminished capacity defense had counsel provided Dr. Martone with the proper materials to obtain a correct diagnosis in the first instance.