J-S83040-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| DARNELL DOGAN | : | |
| | : | |
| Appellant | : | No. 2878 EDA 2016 |

Appeal from the Judgment of Sentence September 6, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0000557-2014

BEFORE:  GANTMAN, P.J., OLSON, J., and DUBOW, J.

MEMORANDUM BY GANTMAN, P.J.:                    **FILED APRIL 09, 2018**

Appellant, Darnell Dogan, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas, following his jury trial conviction of possession with intent to distribute ("PWID").[1]  We affirm.

In its opinion, the trial court fully and accurately sets forth the relevant facts and procedural history of this case.  Therefore, we have no need to restate them.  We add the court sentenced Appellant on September 6, 2016, to twenty-one (21) to forty-two (42) months' incarceration, plus five (5) years' probation.  On September 13, 2016, Appellant filed a timely notice of appeal.  The court ordered Appellant on September 20, 2016, to file a concise statement of errors complained of on appeal per Pa.R.A.P. 1925(b);

_____

[1] 35 P.S. § 780-113(a)(30).

Appellant complied on February 24, 2017, following an extension.

Appellant raises one issue for our review:

DID NOT THE TRIAL COURT ERR IN DENYING APPELLANT'S CHALLENGE, PURSUANT TO **BATSON V. KENTUCKY**, [476 U.S. 79, 106 S.CT. 1712, 90 L.ED.2D 69 (1986)], TO THE COMMONWEALTH'S RACIALLY DISCRIMINATORY USE OF PEREMPTORY STRIKES[?]

(Appellant's Brief at 3).

"The decision whether to disqualify a juror is within the sound discretion of the trial court and will not be reversed in the absence of a palpable abuse of discretion." **Commonwealth v. Stevens**, 559 Pa. 171, 197, 739 A.2d 507, 521 (1999). "A challenge for cause to service by a prospective juror should be sustained and that juror excused where that juror demonstrates through his conduct and answers a likelihood of prejudice." **Commonwealth v. Ingber**, 516 Pa. 2, 7, 531 A.2d 1101, 1103 (1987). "The trial court makes that determination based on the prospective juror's answers to questions and demeanor." **Stevens, supra** at 197, 739 A.2d at 521.

The challenge of a juror for cause is addressed to the trial judge, and much weight must be given to his judgment in passing upon it. In exercising his discretion as to the fitness of a juror to serve, he has the juror before him, and much latitude must be left to him; and the weight to be given to the answers of a juror when examined on his *voir dire* is not to be determined exclusively by his words as we read them in the printed record. They are first to be weighed by the trial judge who sees and hears the juror, and, in the exercise of a wide discretion, may conclude that he is not competent to enter the jury box for the purpose of rendering an impartial verdict, notwithstanding

his words to the contrary….

***Commonwealth v. Robinson***, 581 Pa. 154, 204, 864 A.2d 460, 490 (2004), *cert. denied*, 546 U.S. 983, 126 S.Ct. 559, 163 L.Ed.2d 470 (2005) (quoting ***Commonwealth v. Sushinskie***, 242 Pa. 406, 413, 89 A. 564, 565 (1913)). "[A] finding regarding a [venireperson's] impartiality 'is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province…. The trial judge is of course applying some kind of legal standard to what he sees and hears, but his predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record.'" ***Commonwealth v. Smith***, 518 Pa. 15, 37, 540 A.2d 246, 256 (1988) (quoting ***Wainwright v. Witt***, 469 U.S. 412, 428-29, 105 S.Ct. 844, 854-55, 83 L.Ed.2d 841, ___ (1985)). "A juror's bias need not be proven with unmistakable clarity." ***Commonwealth v. Carson***, 590 Pa. 501, 573, 913 A.2d 220, 262 (2006), *cert. denied*, 552 U.S. 954, 128 S.Ct. 384, 169 L.Ed.2d 270 (2007).

Applying the rationale of ***Batson*** to a claim of purposeful discrimination based on race and/or gender as it applies to jury selection/elimination requires the following under Pennsylvania law:

> To establish…a *prima facie* case, a defendant must show that he is of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact…that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate. Finally, the defendant must show that these

- 3 -

facts and **any other relevant circumstances** raise an inference that the prosecutor used that practice to exclude venire[persons] for the petit jury on account of their race. This combination of factors in the empanelling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.

*Commonwealth v. Hill*, 727 A.2d 578, 581-82 (Pa.Super. 1999), *appeal denied*, 561 Pa. 653, 747 A.2d 898 (1999) (internal quotations omitted) (emphasis in original). After establishing this record, the trial court must consider the totality of the circumstances to determine whether the defendant has made a *prima facie* case of purposeful discrimination. *Id.*

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Charles A. Ehrlich, we conclude Appellant's issue merits no relief. The trial court opinion comprehensively discusses and properly disposes of the question presented. (*See* Trial Court Opinion, filed May 17, 2017, at 3-7) (finding: record does not demonstrate Commonwealth purposefully discriminated against African-American venirepersons; during **Batson** hearing, Commonwealth offered credible, specific, and race-neutral explanations for striking each African-American venireperson at issue). The record supports the trial court's rationale, and we see no reason to disturb it. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judge Dubow joins this memorandum.

Judge Olson concurs in the result.

- 4 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/9/18

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION – CRIMINAL SECTION

**FILED**

**MAY 1 7 2017**

**Office of Judicial Record**
**Appeals/Post Trial**

Commonwealth of Pennsylvania      :     CP-51-CR-0000557-2014

                       :

v.                             :

                       :     SUPERIOR COURT
Darnell Dogan                 :     NO. 2878 EDA 2016

CP-51-CR-0000557-2014 Comm. v. Dogan, Darnell
Opinion



7948177431

OPINION

Ehrlich, J.

Darnell Dogan, hereinafter Appellant, was found guilty of possession of a controlled substance with intent to deliver heroin and/or crack cocaine following a jury trial on June 20, 2016. The charges stem from a series of drug transactions on the 2900 block of Gransback Street in North Philadelphia on December 30, 2013.

On September 6, 2016, Appellant was sentenced to an aggregate term of twenty-one to forty-two months of incarceration. A timely appeal followed.

On appeal, Appellant avers three points of error:

1. The court erred in denying the defendant's challenge pursuant to *Batson v. Kentucky*, to the Commonwealth's racially-discriminatory use of peremptory strikes.

2. The court erred in denying the defendant's request to have new counsel appointed, and in failing to conduct a sufficient inquiry regarding the development of irreconcilable differences with the attorney/client relationship.

3. The court erred in denying the defense motion to set aside the verdict and for a new trial where there was evidence that paperwork used during voir dire was taken and used to pass a message relating to pretrial negotiations, demonstrating that outside parties had information related to the inner workings of the case, raising the specter of jury tampering, improper extrinsic

1

influence on the jury and a reasonable likelihood of prejudice, thereby impugning the integrity of the verdict and denying the defendant his right to a fair trial.

Appellant's Pa.R.A.P. 1925(b) Statement.

As discussed below, these claims are without merit. Accordingly, no relief is due.

## The Evidence

On December 30, 2013 at approximately 1:00 p.m., Officer Louis Hardy and Officer Carl Stubbs setup surveillance in the area of 2900 Gransback Street. Notes of Testimony ("N.T."), 6/16/2016, at 45. Officer Hardy surveyed the area using 20 by 50 binoculars from the passenger seat of a vehicle. *Id.* The binoculars amplified his field of view to twenty times that of the naked eye. *Id.* Officer Hardy observed Appellant walk back and forth on the block while counting money. *Id.* at 50.

Officer Hardy has been a Philadelphia police officer for 26 years. *Id.* at 43. He was a member of the Narcotics Strike Force for three years. *Id.* For the last 16 years, he has been a member of the Narcotics Field Unit. *Id.* at 43. Based on his training and experience in the East Division, he stated the area is a popular drug trafficking section of the city and is "infested with drugs." *Id.* at 48. When police conduct surveillance of this particular area, Officer Hardy said it, "is not a question of if there is a dealer selling drugs on the block, it['] s [a] matter of when the dealer is going to show [sic] on the block selling drugs." *Id.* at 46.

From about 1:00 p.m. to 1:50 p.m., Officer Hardy observed four separate drug transactions between Appellant and others on Gransback Street. *Id.* During each transaction, the individuals would engage in a brief conversation with Appellant before handing him money. *Id.* Appellant would then walk to a garage on Gransback Street, bend down out of view, stand up and walk back to these same individuals. *Id.* Appellant handed an unidentified object to each of them. *Id.* at 58. During each incident, no one was present other than Appellant and the buyers. *Id.* In the first

2

three incidents, the suspected buyers were stopped by police following the observed transactions. *Id.* Each of these buyers tested positive for narcotics once stopped by police. *Id.* at 60.

Appellant was arrested by Officer Stubbs following the fourth transaction. *Id.* Officer Stubbs recovered $120 from Appellant's person. *Id.* Officer Stubbs' back-up, Officer Kuhn, went to the garage area that Appellant frequented during the transactions. *Id.* He recovered a cellophane packet containing ten packets of heroin. *Id.* The packets matched what was recovered from two of the individuals. *Id.* at 61. Following a two-day trial, Appellant was found guilty of possession with intent to distribute illegal drugs by a jury of his peers.

## Discussion

### *Batson* Challenge

Appellant's first contention on appeal is that the court erred in denying the defendant's challenge pursuant to, *Batson v. Kentucky*, regarding the Commonwealth's racially discriminatory use of peremptory strikes. 476 U.S. 79 (1986).

In *Batson,* the U.S. Supreme Court held that "the Equal Protection Clause forbids [a] prosecutor to challenge potential jurors solely on account of their race." *Id.* at 89. The framework for analyzing a *Batson* claim is as follows:

[F]irst, the defendant must make a *prima facie* showing that the circumstances give rise to an inference that the prosecutor struck one or more prospective jurors on account of race, second, if the *prima facie* showing is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror(s) at issue, and third, the trial court must then make the ultimate determination of whether the defense has carried its burden of proving purposeful discrimination.

3

*Id.* at 97.

To establish a *prima facie* case of purposeful discrimination ... the defendant must show that he [i]s a member of a cognizable racial group, that the prosecutor exercised a peremptory challenge to remove from the venire members of the defendant's race and that other relevant circumstances combine to raise an inference that the prosecutor removed the juror(s) for racial reasons. *Id.* at 96.

The second prong of the *Batson* test, involving the prosecution's obligation to come forward with a race-neutral explanation of the challenges once a *prima facie* case is proven, "does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem,* 514 U.S. 765, 767–68 (1995). Rather, the issue at that stage "is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.*

If a race-neutral explanation is tendered, the trial court must then proceed to the third prong of the test, *i.e.,* the ultimate determination of whether the opponent of the strike has carried his burden of proving purposeful discrimination. *Id.* at 768. It is at this stage that the persuasiveness of the facially-neutral explanation proffered by the Commonwealth is relevant. *Id.*

"The trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal and will not be overturned unless clearly erroneous." *Miller–El v. Cockrell,* 537 U.S. 322, 340 (2003) (quoting *Hernandez v. New York,* 500 U.S. 352, 364 (1991) (plurality)). There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. *Id.* As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on

4

demeanor and credibility lies 'peculiarly within a trial judge's province.' *Hernandez v. New York*, 500 U.S. 352, 365 (1991).

Pursuant to Pennsylvania Rule of Criminal Procedure Rule 634, "In trials involving a non-capital felony and when there is only one defendant, the Commonwealth and the defendant shall each be entitled to 7 peremptory challenges." 2A West's Pa. Prac., Rules of Criminal Procedure Rule 634.

The record reveals that, approximately two-thirds of the way through voir dire, the Public Defender raised a *Batson* challenge in response to the Assistant District Attorney's use of preemptory strikes. N.T. 6/15/2016 at 34. The Public Defender argued the Assistant District Attorney had used every preemptory strike, except one, against prospective African American jurors. *Id.* at 35. In response, the court held a *Batson* hearing and instructed the Commonwealth to offer an explanation for each strike. *Id.*

The Assistant District Attorney explained his reason for striking the African-American venire persons, respectively, as follows:

MICHAEL MANARA: Juror No. 9 was the black female. The issue the Commonwealth had with strike was two incidents that I believe she had with the police. I believe it was stolen car or some of those things where there were no arrests made [sic]. So it was twice she called the police and no arrests were made. . . Juror No. 21 yesterday [sic] is a black male. The reason for the strike is [sic] when he was answering his questions he seemed out of it. He didn't actually know what his wife did for a living. I don't believe he knew what her age was. Juror No. 27 yesterday was a black male. The way he pulled out his questionnaire, on top of the fact that... the way it was filled out was a problem. As well as today, Juror No. 2

5

there was [sic] some issues with [a] hearing problem. She didn't seem to understand or hear when she first looked out [sic] when Your Honor was talking. She looked at me. So I want a juror to pay attention. That was the reason for the strike. And [Juror No. 7] doesn't have a job, not in college. Also, the fact that during your opening voir dire. . . his eyes were closed. I also wrote the fact that I believe he was snickering during one of the questions. That is the reason for the strike. . .

N.T. 6/15/2016 at 35-37.

Under the burden-shifting framework of *Batson*, Appellant was required to establish a *prima facie* case of purposeful discrimination in certain peremptory challenges before the Commonwealth was required to provide race-neutral reasons for those challenges. *Batson*, at 97. Once the Commonwealth provided such reasons, the burden returned to Appellant to dispute the persuasiveness of those reasons.

In determining whether the prosecution has satisfied its burden of producing a race-neutral explanation for a peremptory challenge, it is important to remember that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Rice v. Collins*, 546 U.S. 333, 338 (2006) (quoting *Purkett*, 514 U.S. at 768, 115 S.Ct. 1769) (emphasis added). *Com. v. Cook*, 952 A.2d 594, 607 (Pa. 2008).

In the instant case, there was no evidence presented of purposeful discrimination. Neither Appellant's argument on appeal nor objection during voir dire refer to any circumstances which indicate discriminatory intent, other than the percentage of African-Americans stricken. As demonstrated during the *Batson* hearing, the prosecutor offered specific explanations with respect to these particular African-American venire persons. His explanation for striking each African-American juror were specific, credible and race-neutral. The ability to be fair and impartial, remain

6

physically and mentally alert and follow simple court instructions, constitute valid reasons to strike a prospective juror.

These reasons offer evidence as to the state of mind of the prosecutor in voir dire. As stated, an evaluation of the prosecutor's state of mind based on demeanor and credibility lies within a trial court's province. For the foregoing reasons, Appellant's claim that the court erred in denying Appellant's challenge pursuant to *Batson* must fail.

*Attorney/Client Relationship*

Appellant next contends the court erred in denying the defendant's request to have new counsel appointed and failed to conduct a sufficient inquiry into the development of irreconcilable differences within the attorney- client relationship. This claim should fail because "irreconcilable differences warranting appointment of new counsel are not established where the defendant merely alleges a strained relationship with counsel, where there is a difference of opinion in trial strategy, where the defendant lacks confidence in counsel's ability, or where there is brevity of pre-trial communications." *Commonwealth v. Grazier*, 570 A.2d 1054, 1055-56 (Pa. Super. 1990).

The right to appointed counsel does not include the right to counsel of the defendant's choice. *Commonwealth v. Albrecht*, 720 A.2d 693, 709 (Pa. 1998). As a general rule, a defendant must show irreconcilable differences between himself and his court appointed counsel before a trial court will be reversed for refusing to appoint new counsel. Whether to grant a defendant's petition to replace court appointed counsel is a decision which is left to the sound discretion of the trial court. *Grazier*, at 1055.

On the first day of trial in the instant case, the Public Defender informed the court that Appellant wished to remove her as counsel. N.T. 6/16/2016 at 9. The Public Defender stated Appellant felt the two were "having problems communicating in a way that [Appellant] finds

7

satisfactory." *Id.* at 10. Furthermore, the Public Defender stated Appellant did not, "feel comfortable that I am representing him in a way that he feels is in his best interest. He's concerned about my professionalism. And he wants to make sure that he has an attorney he is comfortable with to try his case." *Id.* Appellant explained to the court his issues with counsel's representation. *Id.* He stated he was concerned that the Public Defender discussed details of his case in the hallway before court that day. *Id.* Their conversation was allegedly within earshot of the police officers and Assistant District Attorney. *Id.* Furthermore, Appellant stated the Public Defender told him there would be "no more discussion of [his] case" before trial. *Id.* at 11.

The court called on the Public Defender to respond. The Public Defender stated she did not discuss any facts of the case, or anything related to Appellant's case, in the hallway. *Id.* It was simply a conversation regarding whether the two would discuss the case further. *Id.* She told Appellant, "if he had specific questions for me, I'd be happy to answer them, but right now I need to focus on being mentally prepared for opening and closing." *Id.* at 12.

The court found the Public Defender was ready, willing and able to provide Appellant with effective representation given her experience and preparation. *Id.* The court advised Appellant that he had a right to effective representation - not any particular representation of his choice. *Id.* Although Appellant may not have felt comfortable with the Public Defender, the court held his grievance was an insufficient basis to appoint new counsel. *Id.*

This case is similar to the facts of *Commonwealth v. Chew.* 487 A.2d 1379 (Pa. Super. 1985). In *Chew*, the defendant became dissatisfied with appointed counsel due to a difference of opinion in trial strategy and what the defendant perceived as counsel's inadequate preparation for trial. The defendant was so disgruntled that he spit in counsel's face on the first day of trial. *Id.* However, the trial court held counsel was both willing and able to represent the defendant and the

8

motion for appointment of counsel was denied. *Id.* On appeal, the Superior Court held the trial court did not abuse its discretion. The court noted, "An indigent defendant does not have a right to counsel of his own choosing, and mere differences of opinion concerning strategy or the brevity of pre-trial communications does not compel the appointment of new counsel." *Id.* at 1383.

Here, Appellant's counsel informed the court that Appellant felt the two were still "having problems communicating in a way that [the Appellant] finds satisfactory." Appellant did not "feel comfortable that [the Public Defender was] representing him in a way that he feels is in his best interest." Appellant stated he was concerned about the public defender's professionalism and wanted "an attorney he is comfortable with to try his case." The court directed Appellant to describe specific issues he was having with the Public Defender. Appellant proceeded to explain his concern with counsel's lack of privacy given that she spoke about his case within earshot of the police and members of the District Attorney's Office. In rebuttal, the Public Defender stated she did not discuss any facts of the case, or anything related to the case, in the hallway. She said she was simply trying to discuss the status of Appellant's case and dissuade him from making outbursts in the courtroom. The court questioned counsel regarding her preparation and familiarity with the case and concluded she was adequately prepared. The court found she was both willing and able to defend the charges against Appellant. As a result, the court denied Appellant's request for appointment of new counsel.

Similar to *Chew*, it was not an abuse of discretion for the court to deny Appellant's request for new counsel. The court held a hearing to discuss Appellant's issues, heard from the respective parties and confirmed the Public Defender was ready, willing and able to proceed on Appellant's behalf. After sufficient inquiry the court concluded the Public Defender was an experienced and competent trial attorney who could render effective representation in this case. As stated,

9

Appellant's lack of confidence in counsel's ability, or concern regarding the brevity of pre-trial communications, constitute an insufficient bases on which to appoint new counsel.

Therefore, Appellant's motion for appointment of counsel was properly denied and Appellant's claim must fail.

### Jury Tampering

Finally, Appellant asserts the trial court erred in denying the defense motion to set aside the verdict and for a new trial based on the paperwork discovered by Appellant's wife on the day of the verdict.

The denial of a motion for a mistrial is assessed on appellate review according to an abuse of discretion standard. *See Commonwealth v. Savage*, 602 A.2d 309, 312 (Pa. 1992). Upon the making of a motion, the central task confronting the trial court is to determine whether misconduct or prejudicial error actually occurred, and if so, to assess the degree of any resulting prejudice. *See generally Commonwealth v. Boczkowski*, 846 A.2d 75, 94 (Pa. 2004) (characterizing a mistrial as an extreme remedy that needs only be granted where a prejudicial event may reasonably be said to have deprived the defendant of a fair trial). *Commonwealth v. Sanchez*, 907 A.2d 477, 491 (Pa. 2006).

A defendant has the right to have his or her case heard by a fair, impartial, and unbiased jury and ex parte contact between jurors and witnesses is viewed with disfavor. *Commonwealth v. Brown*, 786 A.2d 961, 972 (Pa. 2001). A trial court need only grant a mistrial where the alleged prejudicial event may reasonably be said to have deprived the moving party of a fair and impartial trial. *Commonwealth v. Fletcher*, 750 A.2d 261, 282 (Pa. 2000).

In this case, trial lasted for two days. On June 20, 2016, at about 11:16 a.m., the jury reached a verdict. N.T. 6/20/2016 at 4. The jury entered the courtroom at 11:22 a.m. *Id.* Shortly

10

after the court crier asked the foreperson to rise and deliver the verdict, Appellant stated, "my wife was just presented with a statement with the jurors names . . ." *Id.* The jury proceeded to deliver the verdict and found Appellant guilty of all charges. *Id.* at 5. The jury then exited the courtroom. *Id.* at 9.

After the jury exited, the Public Defender informed the court that Appellant's wife was just handed a "venire panel list. . . with something written on it." *Id.* On the bottom of the paper was an anonymous message: "You should have taken the deal." *Id.* at 10. The paper contained approximately 20 – 30 names of prospective jurors summoned for the first day of jury selection. *Id.* at 17. Appellant's wife stated she was handed the paper in a bathroom two floors below the courtroom. *Id.* The court called Appellant's wife, Sheniya Pearson, to the stand. *Id.* Ms. Pearson stated she was in the bathroom, about 20 - 15 minutes before the jury delivered the verdict, when an unknown individual knocked on the stall door. Ms. Pearson responded, "I'm in here." *Id.* The anonymous individual said, "I know," and slid a sheet of the venire panel underneath. *Id.* Ms. Pearson opened the door but no one else was in the bathroom. *Id.* at 17. The Public Defender then moved for a mistrial which was denied. *Id.*

The Public Defender and the Assistant District Attorney stated they each passed their copy of the venire panel sheet to the court crier on the day the jury was finalized. *Id.* The court crier stated the Public Defender's copy was subsequently destroyed. *Id.* The court directed the Commonwealth to investigate the matter, specifically who was with the jury on the day of the verdict. *Id.*

On September 6, 2016, the Commonwealth submitted their findings. A week or two after the verdict, the District Attorney's Office invited Ms. Pearson into the office to discuss the paper. N.T. 9/6/2016 at 4. Yet, she failed to appear. *Id.* at 5. The Commonwealth described how

11

detectives attempted to locate Ms. Pearson but were unable to obtain a statement. *Id.* The Commonwealth indicated that no statement or additional investigation had transpired. *Id.* The Public Defender requested that the court grant a new trial, given the circumstances and possible threat to the integrity of the verdict.

The court held a hearing. The court crier was called to the stand regarding the jury selection procedure. The court crier directs prospective jurors through the selection process in the Juanita Kidd Stout Criminal Justice Center. She identified the paper handed in by Ms. Pearson as the last page of the jury panel paperwork. *Id.* at 10. Per the court crier, during voir dire, jurors' names are listed on two separate sheets of paper, and copies are made for herself, the stenographer, the court clerk, counsel for each party and the Judge. *Id.* at 18. Jurors who present individual hardships are dismissed first. *Id.* The remaining jurors are separated into two groups based on their answers on the "Juror Information Questionnaire." Individuals who answer "yes" to certain questions regarding impartiality are circled on the venire panel sheet. The court is the only party that keeps a copy of the circled panel sheet. *Id.*

Per standard practice, the court crier keeps two copies of the venire panel sheet at her desk during voir dire. *Id.* On this particular day, she stated she left the sheets on her desk while she was at lunch and the courtroom doors remained open during the break. *Id.* After she returned from lunch, she did not notice anything suspicious about the state of her desk. *Id.* at 19. She stated the papers were destroyed immediately after jury selection was complete. *Id.* at 25.

During opening instructions, the court instructed the jury to notify the court immediately if anyone attempts to contact them regarding the case. *Id.* On the day of the verdict, the court crier stated the jury was escorted to the second floor of the building in an effort to isolate them from the public. *Id.* at 13. A court officer then escorted them to the jury deliberation room adjacent

12

to the courtroom on the sixth floor. *Id.* at 12. The jury started deliberating on Friday, June 17, 2016 and reached a verdict on Monday, June 20, 2016. *Id.* No jurors informed the court at any time that they were contacted about the case. *Id.*

At the conclusion of testimony, the Commonwealth asked the court to deny Appellant's motion for a mistrial. *Id.* The Commonwealth argued the paper was of no significance since none of the jurors on the sheet were even selected for the final jury panel. *Id.* These individuals had no knowledge of the facts of the case and certainly no information regarding pretrial negotiations. *Id.* The plea deal was conveyed to the defendant back in July 2015 - almost a year before trial. *Id.* at 28. Furthermore, on the day Ms. Pearson was allegedly handed the venire panel sheet, all jurors were accounted for. Court staff monitored each prospective juror closely, before and during trial. *Id.* The only time a juror was unsupervised was when he or she went to lunch or used the restroom. *Id.*

The Public Defender argued for a mistrial. *Id.* Her argument was largely based on the ambiguity surrounding the paper's chain of custody. *Id.* Her concern was someone could have obtained the venire panel sheet during jury selection, kept it and followed the defendant's wife into the fourth floor bathroom in an effort to taint the verdict. *Id.* Based on these facts, she argued the verdict should be set aside. *Id.* at 33.

Appellant's claim to set aside the verdict must fail for several reasons. First, Appellant presumes prejudice from the trial court's denial of the motion to set aside the verdict. However, this is not the test. The burden is on the moving party, here Appellant, to prove he suffered prejudice. Second, once the moving party shows prejudice, the trial court must assess the extent of the prejudice of the extraneous influence. Appellant never made this showing because he failed to show how this information regarding pretrial negotiations had any influence on the jury. The

court found there was no way for the jury to have been contacted. After being assembled on the second floor, they were escorted directly to the jury deliberation room. Notably, not just a juror, anyone could have possessed the paper. Given the supervision of the jury, the possessor was most likely not a juror.

Furthermore, no evidence demonstrated the paper had an impact on the jury and their deliberations. The only evidence proffered was a paper with an anonymous message regarding a year-old plea deal. Only Appellant and those close to his case would be privy to this type of information. To this end the court noted:

"We had a jury deliberating[.] [So] what you're telling me is that some unknown person . . . got that sheet the first day, kept it and on the day of the verdict found the defendant's wife in another floor['s] bathroom, on the fourth floor, and slipped under the stall to her . . . [the paper containing] jurors who were never chosen and never involved in the case[.] [H]ow does that in any way implicate the verdict in this case? Because the jurors in this case had no knowledge of it, had no contacts . . . nothing was reported."

N.T. 9/6/2016 at 32-33.

The court denied Appellant's motion given the lack of evidence. No evidence was presented that any juror was contacted or tainted with outside information – including any pretrial negotiating between Appellant and the Commonwealth. No evidence even slightly supported the idea that pretrial negotiations were made available to jurors. No court staff was contacted and no juror was reportedly involved. There was no argument made as to what impact, if any, this extraneous information had on the verdict. All that Appellant offered was a piece of paper with an anonymous message regarding a year old plea deal. As the court stated, none of the jurors on

14

the paper allegedly handed to Appellant's wife were even selected for the final jury panel. Even if this information was relayed to the jurors they would have no way of knowing who Ms. Pearson was or her relation to Appellant. Appellant's argument essentially states because there is ambiguity surrounding what, if any, influence the paper had on the jury, the verdict should be set aside. However, Appellant failed to show he suffered any prejudice in connection to this document.

The court concluded Appellant tried to subvert the jury's verdict by having his wife fraudulently claim an unknown individual gave her a note containing information related to plea negotiations. Appellant and his wife conspired to undermine the jury's verdict and threaten the integrity of the court. Based on observations and a review of his record, the court found Appellant was a manipulative liar who has consistently failed to respect the judicial system.

Due to the lack of evidence, the court found the sheet did not impact the jury. Throughout trial the jury was confined to the second and sixth floors of the Juanita Kidd Stout Criminal Justice Center. The jury was closely supervised and all reasonable steps were taken to ensure these individuals were shielded from any outside influence. It would have been nearly impossible for any individual on the final jury panel to have had access to this type of information.

For the foregoing reasons, Appellant's claim that the court erred in denying the motion for a mistrial must fail.

## Conclusion

In summary, this court has carefully reviewed the entire record and finds no harmful, prejudicial, or reversible error and nothing to justify the granting of Appellant's request for relief. For the reasons set forth above, the judgment of the trial court should be affirmed.

J.

16