J-A01044-21

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| RUDOLPH MCGRIFF, | : | |
| | : | |
| Appellant | : | No. 3145 EDA 2019 |

Appeal from the PCRA Order Entered October 24, 2019
in the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0002445-2014

BEFORE:    BENDER, P.J.E., OLSON, J. and STRASSBURGER, J.*

MEMORANDUM BY OLSON, J.:                    **FILED AUGUST 13, 2021**

Appellant, Rudolph McGriff, appeals from an order entered on October 24, 2019, which dismissed his petition for collateral relief filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546.  Upon review, we affirm.

The PCRA court set forth the facts of this case, which involved the fatal shooting of Malisha Jessie, as follows.

> Appellant and Malisha Jessie[1] had been dating on-and-off for approximately [five] years.  Friends and relatives testified that their relationship was "toxic," including testimony from Malisha's sister Priscilla Jessie that Appellant [physically assaulted] Malisha on two occasions.  Malisha's son, Myzeh Jessie, who was 10 years old at the time of the murder, testified that Malisha had discovered Appellant was cheating on her and that Appellant had

---

[1] Within this memorandum, we will refer to individuals involved in the case using surnames.  In the case of the Jessie family, however, we will use first names for clarity.

*Retired Senior Judge assigned to the Superior Court.

moved this woman, ["Femi Johnson,"] into one of his properties on Bailey Street. He testified that he heard Malisha tell Appellant over the phone that she "should have busted the windows out of his car and flattened his tires when she saw their car out there the other day." On April 6, 2013, the day before her death, Malisha drove by the house on Bailey Street with Myzeh. He testified that she got out of the car and called Appellant. They then drove around the neighborhood and found Appellant walking his dog. Malisha exited the vehicle again and got into a screaming fight with Appellant, repeating that she would slash the tires on his car. A surveillance video from a nearby store confirmed [Malisha parked her car on Bailey Street, exited her car, walked north on Bailey Street while on her phone, disappeared from view for a few minutes, and then reappeared on camera walking back towards her car. The video did not capture her interaction with Appellant and his dog]. Myzeh and Malisha then proceeded to a family cookout.

That night, Malisha went out bar-hopping with her friend Erica Burton. Burton testified that at around [2:00 a.m.], she and Malisha got into separate cars to drive home. Instead of following Burton onto Route 76, she noticed that Malisha turned off. The next morning, Malisha's body was found between two parked cars on Bailey Street with two gunshots to her head and a gunshot to her chest. Police recovered Malisha's phone after her death and found photos of Appellant's car in front of the house on Bailey Street as well as a photo of a piece of mail addressed to Femi Johnson at the Bailey Street house. The last photo on Malisha's cell phone was of Appellant's car and was taken at 2:53 a.m. around the corner from Bailey Street. There were also several calls to Johnson's cell phone, where Malisha had blocked her own number from appearing on Johnson's caller [identification functions].

Freddie Brown testified that at some time between [2:00 and 2:30 a.m.], he was asleep in his living room on Bailey Street and heard a man and woman arguing outside. He looked out his window, sat back down, and then heard two gunshots. He looked out again and saw someone standing in the street wearing a gray hoodie. [Lonnie Wilson testified that at around 2:30 a.m. he was asleep inside his home on Bailey Street when he heard two gunshots and a woman yell, "No!"] Eric Wallace, who also lives on Bailey Street, testified that he was asleep in his front upstairs bedroom when he heard a man and woman

arguing. During his interview with police, Wallace stated that he opened his front door to look out [after hearing gunshots] and saw [Appellant], "his old neighbor, Tina's brother," walking by toward Willard Street, wearing a gray hoodie. At trial, he recanted his identification of [Appellant] and testified that he never heard gunshots and when he looked out his front door, he saw someone pass by but he couldn't identify them[.]

Appellant's girlfriend Johnson testified that she had moved into Appellant's Bailey Street house in early 2013 and lived there rent-free. When she asked Appellant about Malisha after seeing her on Instagram, Appellant told her that he and Malisha had dated in the past and [Johnson] assumed that they were no longer together. Johnson testified that on the day of the murder, she was at home and that [Appellant] was in and out all afternoon. She stated that he went out that night with a friend, returned at some point "for a quick second," and then left again. (When testifying before the grand jury, Johnson [] claimed that [Appellant was] with her between 12:48 a.m. and 2:54 a.m.). Johnson testified that Appellant called [] and asked her to bring his two cell phones to him at Charles (a/k/a "Theme") Bonner's house. Cell phone records showed this phone call took place at 2:54 a.m. (Johnson testified at the grand jury that Appellant had been gone at least half an hour before he called her to bring him his cell phones). The Commonwealth introduced evidence that it took 16 minutes to travel by car from Appellant's Bailey Street house to Bonner's house in West Philadelphia. Appellant's lifelong friend, Bonner, testified that on the day of the murder, he and Appellant went to a [hair show]. He then dropped Appellant off at his car[ around 1:00 a.m.] He stated that around "two-something" in the morning, Appellant showed up at his house. Appellant asked to borrow a phone so he could call someone to bring his cell phones to him. Bonner testified that Johnson arrived shortly thereafter.

Appellant's wife Nekeisha Gay-McGriff provided Appellant's *alibi*. She testified that she and Appellant had moved with their children to South Carolina but that they still visited Philadelphia regularly. On the weekend in question, she was in [Philadelphia] with her two daughters visiting relatives. Gay-McGriff stated that on the night of April 6, she planned to begin driving back to South Carolina around 1[:00] a.m. She stated Appellant called her around 12:30 a.m. to see if she was ready to leave. He arrived at her mother's house around 10 minutes later and she

- 3 -

could smell alcohol on his breath, although she did not believe he was drunk. Gay-McGriff testified that she thought it would be unsafe for him to drive so she agreed to drive him to his property on Bailey Street. Gay-McGriff claimed that she stopped at a mini-mart while Appellant waited in the car, called him from inside the store to see if he wanted a snack, then took him to the Bailey Street house, where she parked on 26th Street closer to Willard Street. She claimed that Appellant left and then returned to the car approximately 15-20 minutes later. She stated that she then dropped him off at a friend's house in West Philadelphia before driving away with her children to return to South Carolina.

Surveillance video from a store at the corner of Bailey and Allegheny Streets showed a man meeting Appellant's description wearing a gray hoodie walking past the store at 1:57 a[.]m. At approximately 2:27 a[.m.], the same man walked on the west side of Bailey Street toward Allegheny Avenue.

After a lengthy police investigation, Appellant was arrested in October 2013, six months after Malisha's murder.

PCRA Court Opinion, 5/12/2020, at 2–5 (party designations altered).

At trial, the Commonwealth alleged that Appellant encouraged Johnson to pressure Wallace not to testify at the preliminary hearings. To show this, the Commonwealth played several recordings of prison telephone calls between Appellant and Johnson after the former was arrested. During those conversations, Appellant and Johnson discussed "jobs" and Johnson's need to talk to a person called "Ms. Molly" who lived on Bailey Street. Johnson disputed the Commonwealth's theory that "Ms. Molly" referred to Wallace and that her job was to ensure that Wallace did not testify at the preliminary hearing. Nonetheless, Johnson conceded that she may have told Appellant on December 7, 2013, that "Ms. Molly is gone." N.T., 6/19/2015, at 140.

Johnson testified before the grand jury on December 6, 2013. Early the following day, December 7, 2013, Johnson

> was driving back down south and was on Route I-95 in Delaware or Maryland when [Appellant] called her; they spoke on the phone for over an hour. Johnson also confirmed that they were having an argument, with [Appellant] saying that she failed to handle her job properly. She noted that as a result of that argument, she turned the car around and drove back up to Philadelphia. Johnson also agreed that having talked to "Ms. Molly," she was back on the road the very next morning.

***Commonwealth v. McGriff***, 160 A.3d 863, 885 (Pa. Super. 2017) (quoting Trial Court Opinion, 4/5/2016) (citations to record omitted).

Wallace did not appear at the December 18, 2013 preliminary hearing, and the hearing had to be continued.

> The Commonwealth introduced evidence that after Wallace failed to appear to testify at the preliminary hearing, a bench warrant was issued and he subsequently went to the District Attorney's Office and told [Detective Edward Tolliver that he was being threatened by unnamed persons who did not want him to testify,] that he was fearful "of the truth[,]" and that he "was not pointing the finger at nobody." Wallace later testified at the preliminary hearing and told the same version of events that he had told detectives, minus his identification of [Appellant] as the man who walked by [toward Willard Street]. Wallace's lifelong friend Marcella Jones testified that Wallace told her that he had been a witness to a homicide but that she stopped him from giving her any details. She testified that Wallace told her he was scared for his life because of what he had seen.

PCRA Court Opinion, 5/12/2020, at 3.[2]

---

[2] Consistent with the Commonwealth's theory that Appellant used "Ms. Molly" as a code name for Wallace, Jones testified that she calls Wallace by the feminine nickname "Erica."

On July 1, 2015, a jury convicted Appellant of first-degree murder, firearms not to be carried without a license, carrying firearms on public streets in Philadelphia, and possessing instruments of crime.[3] On that same date, the trial court imposed an aggregate sentence of life imprisonment without the possibility of parole. This Court affirmed Appellant's judgment of sentence on April 21, 2017. *McGriff*, 160 A.3d at 865. On December 26, 2017, the Pennsylvania Supreme Court denied further review. *Commonwealth v. McGriff*, 176 A.3d 853 (Pa. 2017). Appellant, through counsel, filed a timely PCRA petition on October 14, 2018, and an amended petition on February 26, 2019, raising six claims of ineffective assistance of trial counsel.[4] On September 24, 2019, the PCRA court issued notice of its intent to dismiss Appellant's petition without a hearing pursuant to Pa.R.Crim.P. 907. On October 24, 2019, the PCRA court dismissed Appellant's petition as meritless. This timely appeal resulted.[5]

On appeal, Appellant raises the following issues for our review, all of which present claims of ineffective assistance of trial counsel:

---

[3] 18 Pa.C.S.A. §§ 2502(a), 6106(a)(1), 6108, and 907(a), respectively.

[4] Appellant's claims of ineffective assistance of counsel were organized differently within his PCRA petition than his statement of questions raised on appeal, but they encompass the same claims of error.

[5] The PCRA court did not order Appellant to file a concise statement pursuant to Pa.R.A.P. 1925(b), and none was filed. The PCRA court filed its Rule 1925(a) opinion on May 12, 2020.

1. Was [A]ppellant deprived of the effective assistance of counsel and a fair trial based on the following errors, individually and/or cumulatively:

   A. Trial counsel's failure to investigate the view from the home of alleged eyewitness Eric Wallace, as such an investigation would have demonstrated conclusively that it would be impossible at night to see the face of the perpetrator as he/she walked by wearing a [hooded sweatshirt].

   B. Trial counsel's failure to move *in limine* to preclude or object to 'other acts' and inadmissible hearsay evidence, including (1) that a prosecution witness had been threatened by an unnamed person or persons; (2) hearsay evidence as to the alleged threats; and (3) alleged prior acts of assault upon the deceased.

   C. Trial counsel's failure to object to the instruction on the meaning of an *alibi* defense, which failed to include language (or otherwise convey) that *alibi* evidence, even if not wholly believed, can raise a reasonable doubt as to guilt.

   D. Trial counsel's failure to object to testimony that a relative of [Malisha] did not believe [A]ppellant's denial of involvement in the murder.

   E. Trial counsel's failure to object to the prosecutor's closing argument, which included expressions of personal belief and attacks on counsel.

2. Is Appellant entitled to relief under a cumulative prejudice standard?

Appellant's Brief at 6–7.

Our standard of review of an order dismissing a PCRA petition is as follows:

As a general proposition, an appellate court reviews the PCRA court's findings to see if they are supported by the record and

free from legal error. Th[is C]ourt's scope of review is limited to the findings of the PCRA court and the evidence on the record of the PCRA court's hearing, viewed in the light most favorable to the prevailing party.

***Commonwealth v. Hammond***, 953 A.2d 544, 556 (Pa. Super. 2008) (citations and quotations omitted).

Further,

to establish a claim of ineffective assistance of counsel, a defendant "must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." ***Commonwealth v. Turetsky***, 925 A.2d 876, 880 (Pa. Super. 2007) (citation omitted). The burden is on the defendant to prove all three of the following prongs: "(1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different." ***Id.*** (citation omitted).

We have explained that

[a] claim has arguable merit where the factual averments, if accurate, could establish cause for relief. ***See Commonwealth v. Jones***, 876 A.2d 380, 385 ([Pa.] 2005) ("if a petitioner raises allegations, which, even if accepted as true, do not establish the underlying claim ..., he or she will have failed to establish the arguable merit prong related to the claim"). Whether the facts rise to the level of arguable merit is a legal determination.

The test for deciding whether counsel had a reasonable basis for his action or inaction is whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success. Counsel's decisions will be considered reasonable if they effectuated his client's interests. We do not

employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken.

Prejudice is established if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

**Commonwealth v. Stewart**, 84 A.3d 701, 707 (Pa. Super. 2013) (some internal quotations and citations omitted).

"[B]oilerplate allegations and bald assertions of no reasonable basis and/or ensuing prejudice cannot satisfy a petitioner's burden to prove that counsel was ineffective." **Commonwealth v. Paddy**, 15 A.3d 431, 443 ([Pa.] 2011). Moreover, "[a] failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness." **Commonwealth v. Daniels**, 963 A.2d 409, 419 ([Pa.] 2009) (citation omitted).

**Commonwealth v. Sandusky**, 203 A.3d 1033, 1043–44 (Pa. Super. 2019), *appeal denied*, 216 A.3d 1029 (Pa. 2019) (parallel citations omitted).

### Failure to Investigate Wallace's Viewpoint

In his first issue, Appellant argues that trial counsel was ineffective for failing to investigate the view from Wallace's home to demonstrate that Wallace would have been incapable of seeing the perpetrator's face at the time of the shooting. Appellant's Brief at 25–26.

On this aspect of Appellant's ineffective assistance of counsel claim, the PCRA court noted "counsel's arguments at trial were sufficient to cast doubt on Wallace's ability to identify anyone walking past his house at night." PCRA Court Opinion, 5/12/2020, at 10. Specifically, "Wallace recanted his identification and defense counsel was able to question him at

trial as to his drug use, his physical limitations, and the poor visibility from his front porch[.]" *Id.* Therefore, the PCRA court concluded that trial counsel had a reasonable basis for not investigating the view from Wallace's home. *Id.* Additionally, the PCRA court found Appellant failed to prove prejudice because any photos from Wallace's front porch would have been cumulative and there was overwhelming evidence implicating Appellant in the murder. *Id.* at 10–12.

We agree with the PCRA court's assessment. Appellant has the burden to plead and prove he is entitled to relief under the PCRA. Moreover, our Supreme Court has stated:

> Counsel has a general duty to undertake reasonable investigations or make reasonable decisions that render particular investigations unnecessary. Counsel's strategic choices made after less than a complete investigation are considered reasonable, on a claim of ineffective assistance, precisely to the extent that reasonable professional judgments support limitations on the investigation. Failure to conduct a more intensive investigation, in the absence of any indication that such investigation would develop more than was already known, is simply not ineffectiveness.

*Commonwealth v. Eichinger*, 108 A.3d 821, 847 (Pa. 2014) (internal citations omitted).

The Commonwealth presented over a dozen photographs of the overall view of Bailey Street from various angles and identified the relevant house numbers. N.T., 6/17/2015, at 131–33, 136–42, 145–46. Brown, who testified that he looked onto Bailey Street after hearing gunshots and testified before Wallace took the stand, explained to the jury on

cross-examination that Bailey Street was dark at the time of the shooting and the Commonwealth's crime scene photographs were not representative of the lighting conditions because they were taken the following morning. N.T., 6/18/2015, at 79. Trial counsel introduced a nighttime photograph of Bailey Street from Brown's viewpoint to show the difference. *Id.* at 84-85.

On the stand, Wallace's testimony was inconsistent and reluctant. At first, he testified that he did not hear anything, but then stated that he heard an argument and peeked outside to see somebody he did not know walking past his house. He said that he could not see well because his screen door blocks the streetlights. N.T., 6/22/2015, at 145–48. He initially testified that he never heard gunshots. *Id.* at 149. When confronted with his statement to police, Wallace acknowledged giving the statement, but claimed it was not true because he did not see anything and that he was under the influence of Percocet, chemotherapy, and crack cocaine at the time he gave the statement. *Id.* at 164–78. When confronted with his preliminary hearing testimony, he acknowledged testifying that he heard arguing and gunshots. *Id.* at 207–11. Nonetheless, he insisted that he did not see anything because he was asleep. *Id.* at 211.

On cross-examination, trial counsel elicited from Wallace that he gave the statement to police because they were cruel to him. *Id.* at 230. Trial counsel highlighted Wallace's medical ailments, his use of Percocet, chemotherapy, and crack cocaine, and his mistreatment at the hands of the

detectives.  *Id.* at 231–37, 239.  When confronted with his cross-examination from the preliminary hearing, he agreed that he testified it took him over 20 minutes to go downstairs and look out his front door after hearing the argument and gunshots, and that he could not identify the person he saw walk past his house because he only "cracked" the door and saw the person for a "split second."  *Id.* at 241–44.  On redirect examination, Wallace testified that he did not hear anything because he was asleep.

Brown consistently stated that he looked onto Bailey Street after hearing gunshots.  Therefore, trial counsel's strategy was to impeach Brown's ability to see anything on the street because the street was dark around 2:30 a.m.  Wallace, on the other hand, did not consistently state that he heard or saw anything on Bailey Street.  Accordingly, trial counsel chose not to focus on Wallace's inability to see Bailey Street clearly.  Instead, trial counsel focused on Wallace's medical ailments and the mistreatment of Wallace by the detectives to undermine his police statement where he claimed to have heard the argument and gunshots and identified Appellant as the individual who walked past his house, as well as his preliminary hearing testimony where he claimed he heard the argument and gunshots but could not identify the person walking past his house.  By doing so, counsel sought to bolster Wallace's trial testimony that he did not hear or see anything.  Alternatively, if the jury believed that Wallace must have

heard something, this strategy allowed the jury to focus on Wallace's preliminary hearing testimony where he stated that it took him at least 20 minutes to look outside after hearing the gunshots, and therefore could not have seen anything relevant to the shooting.

Thus, the PCRA court properly determined that Appellant failed to prove that counsel acted unreasonably because counsel's strategy of bolstering Wallace's trial testimony over his contradictory statement to police was not unreasonable. Additionally, the PCRA court properly determined that Appellant failed to prove that the outcome of the trial would have somehow been different had trial counsel investigated and introduced photographs showing the view from Wallace's front porch.

### Failure to Object to Threats Evidence

Next, Appellant claims that trial counsel was ineffective for failing to object to other acts and inadmissible hearsay evidence regarding threats to Wallace and Appellant's prior assaults upon Malisha. Appellant's Brief at 32.

Preliminarily, after being corrected by the Commonwealth, Appellant conceded in his reply brief that trial counsel **did** object to the Commonwealth's pre-trial motion *in limine* to admit other acts evidence of Appellant's abuse of Malisha. **See** Appellant's Reply Brief at 9; **see also** N.T., 3/31/2015, at 9–14, 18–19. As such, the PCRA court did not err in dismissing this claim because counsel cannot be deemed ineffective for failing to do something counsel, in fact, did.

As to the testimony regarding the alleged threats against Wallace, Appellant specifically argues that counsel was ineffective for failing to object to Detective Tolliver's testimony that "Wallace reported having been threatened by other persons" and Jones's testimony that "Wallace told her he was scared for his life because he was a witness and knew the killer." Appellant's Brief at 32. According to Appellant,

> [N]o evidence linked [Appellant] to the threats made against Wallace. This error was compounded by the inadmissible hearsay uttered by … Jones. Her testimony directly linked threats and fear to the claim that Wallace knew the killer, who [Appellant] was alleged to be. Counsel's error here was twofold; the failure to object to threats evidence and the failure to challenge hearsay.

*Id.* at 33.

We begin with the portion of Detective Tolliver's testimony, to which Appellant claims counsel should have objected.

Prosecutor: Prior to [Wallace] taking the stand that morning on February 25, 2014, did Mr. Wallace tell you anything in an anteroom just outside the courtroom?

Detective Tolliver: Yes, sir, he did.

Prosecutor: What did he tell you?

Detective Tolliver: He just made a statement to me that people don't want him to testify.

Prosecutor: Did he tell you who these people were that did not want him to testify?

Detective Tolliver: No, sir. I asked him. I asked Mr. Wallace several times was he being threatened? Who? I offered to move Mr.

- 14 -

Wallace. I actually offered to move Mr. Wallace when I first came in contact with him, to make arrangements to have him moved if he felt that he was in any danger.

Prosecutor: Did he ever take you up on those offers?

Detective Tolliver: No, sir.

Prosecutor: Did he ever tell you that he was threatened?

Detective Tolliver: He did. He never said who, but he did.

N.T., 6/24/2015, at 58 (party designations added).

As to Jones, the portion of her testimony pertaining to Wallace being threatened is as follows.

Prosecutor: Did Mr. Wallace tell you that he was threatened?

Jones: Yes.

Prosecutor: What did he tell you?

Jones: He said that he was scared for his life because his name and address was in the paper. And he said he knows people, the—person—the people knew him, knew where he lived at, and he was scared for his life because he was a witness.

N.T., 6/23/2015, at 138 (party designations added). On cross-examination, the following exchange occurred between trial counsel and Jones.

Trial counsel: And turning you to – actually, Mr. Wallace was afraid because his name was in the paper; is that what you said?

Jones: That's what he stated, yes.

- 15 -

| | |
|---|---|
| Trial counsel: | He didn't tell you that anyone had threatened him, did he? |
| Jones: | He just said that he was scared for his life. Because, you know, he was threatened by—I guess, he was threatened by the paper, okay? Because was his name was in the paper and that's it. So far as being threatened by anyone, that I don't know. |

*Id.* at 140–41 (party designations added).[6]

On this aspect of Appellant's ineffectiveness claim, the PCRA court concluded that "[t]his claim is without merit as the Commonwealth properly introduced evidence to explain why Wallace may have recanted his prior identification." PCRA Court Opinion, 5/12/2020, at 12.

"Hearsay is an out-of-court statement offered for the truth of the matter asserted. Hearsay generally is inadmissible unless it falls within one of the exceptions to the hearsay rule delineated in the Pennsylvania Rules of Evidence." *Commonwealth v. Sandusky*, 203 A.3d 1033, 1054 (Pa. Super. 2019) (citation and quotation marks omitted).

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> * * *
>
> **(3) Then-Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then-existing

---

[6] During his direct examination, Wallace disputed that he told Detective Tolliver that people did not want him to testify and that he told Jones that he was being threatened. N.T., 6/22/2015, at 194, 226.

state of mind (such as motive, intent or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Pa.R.E 803(3).

Wallace's statements to Detective Tolliver and Jones constitute hearsay. However, the statements were admissible under the state-of-mind exception to show how Wallace's fear of reprisal explained inconsistencies which emerged in his statement to police, his testimony at Appellant's preliminary hearing, and his testimony at trial. **See Commonwealth v. Ragan**, 645 A.2d 811, 818-19 (Pa. 1994) (affirming admission of testimony, under state-of-mind exception to the rule against hearsay, that eyewitness told a detective he did not wish to talk to detective in front of his wife because she was pressuring him not to testify); **see also id.** at 824 (holding prosecution's questioning of witness about threats to family was permissible to explain prior inconsistent statement). Because the statement was admissible pursuant to a hearsay exception, Appellant's underlying claim lacks arguable merit.

Nonetheless, Appellant argues that the testimony was inadmissible pursuant to this hearsay exception because the trial court failed to provide an instruction limiting the jury's consideration of the testimony to evaluating Wallace's state of mind. Appellant's Reply Brief at 7. "[I]t is well-settled that evidence which is admitted for a limited purpose must be accompanied

by a limiting instruction to focus the jury's consideration of the evidence to its appropriate purpose." *Commonwealth v. Coleman*, 230 A.3d 1042, 1048, (Pa. 2020) (citations omitted). Appellant is correct that the trial court erred in failing to provide a limiting instruction at the time the challenged evidence was adduced or in its final jury instructions. In that regard, Appellant's narrow claim that counsel should have objected on hearsay grounds because the court failed to give a limiting instruction has arguable merit.

We turn next to the prejudice prong, cognizant of the following. A reasonable inference can be drawn that a defendant intends to intimidate a witness when his family or friends attempt to bribe or threaten a witness. *Commonwealth v. Johnson*, 838 A.2d 663, 680 (Pa. 2003) (concluding threatening statements by third parties where the defendant is aware of and authorizes the statements are relevant and admissible). Such evidence can demonstrate the defendant's consciousness of guilt. *Commonwealth v. Rega*, 933 A.2d 997, 1009 (Pa. 2007) ("This Court has long recognized that any attempt by a defendant to interfere with a witness's testimony is admissible to show a defendant's consciousness of guilt."). Courts generally admit the threatening statements via the testimony of a non-declarant listener, "because the evidence is not offered to establish the truth" of what is said in the threatening statement, but "to demonstrate the fact of the

[attempt to influence the listener]." ***Johnson***, 838 A.2d at 680 (citations omitted).

Here, Wallace did not implicate Appellant or anyone related to Appellant when he told Detective Tolliver and Jones that he had been threatened. Therefore, unlike the above-referenced cases, it would be improper in this case to place the challenged statements before the jury to show that Appellant threatened Wallace. Notwithstanding, the prison telephone calls, detailed partially above, along with the testimony of Wallace and Johnson, provided an alternate means which allowed the jury to connect the dots between the "job" with "Ms. Molly" that Appellant assigned to Johnson; Wallace's failure to appear at the December preliminary hearing; and Wallace's changed testimony following his failure to appear at the December preliminary hearing. This combination of evidence suggested that Johnson threatened Wallace at Appellant's behest. The jury was permitted to connect those dots and infer that Wallace's fearful state of mind was a result of those threats, which Wallace conveyed to Detective Tolliver and Jones. Thus, even if the court gave a limiting instruction, there is a compelling likelihood that the jury would have attributed the threats targeting Wallace to Appellant. Accordingly, because a limiting instruction was unlikely to produce a different result, Appellant was not prejudiced by trial counsel's failure to ensure the issuance of the hearsay limiting instruction, and the PCRA court did not err in dismissing this claim.

### Failure to Object to *Alibi* Instruction

Next, Appellant claims that trial counsel was ineffective for failing to object to the trial court's *alibi* instruction. Appellant's Brief at 43.

An *alibi* is "a defense that places the defendant at the relevant time at a different place than the scene involved and so removed therefrom as to render it impossible for him to be the guilty party." ***Commonwealth v. Bryant***, 855 A.2d 726, 741 (Pa. 2004) (citations omitted). "Where such evidence has been introduced, a defendant is entitled to an *alibi* instruction to alleviate the danger that the jurors might impermissibly view a failure to prove the defense as a sign of the defendant's guilt." ***Id.***

> Our Supreme Court has … re-emphasized the importance of a jury instruction which adequately explains to the jury the significance of an *alibi* defense. In ***Commonwealth v. Saunders***, … 602 A.2d 816 ([Pa.] 1992), the Court explained that a jury instruction, when viewed as a whole, must protect against the danger that a jury, if not fully persuaded by the *alibi* witnesses, might consider defendant's failure to prove the defense as evidence of guilt. This concern stems from the seminal case of ***Commonwealth v. Pounds***, … 417 A.2d 597 ([Pa.] 1980), wherein the Court stated that reversible error occurred when "the trial court failed to instruct the jury that it should acquit if Pound's *alibi* evidence, even if not wholly believed, raised a reasonable doubt of his presence at the scene of the crime and its commission, and thus, of his guilt." ***Id.*** [] at 603 (citations omitted).
>
> In ***Saunders***, the Supreme Court reiterated the importance of a carefully crafted *alibi* instruction, but rejected the contention that an adequate *alibi* instruction must contain the ***Pounds*** "even if not wholly believed" language:
>
> > As long as an *alibi* instruction makes it clear that a defendant's failure to prove *alibi* is not in itself basis for a finding of guilt, the instruction cannot be

faulted for failing to parrot the exact language contained in ***Pounds****.* An instruction is proper if it expressly informs the jury that *alibi* evidence, either by itself or together with other evidence, could raise a reasonable doubt as to the defendant's guilt and clearly directs the jury to consider this evidence in determining whether the Commonwealth met its burden of proving beyond a reasonable doubt that the crime was committed by the defendant. A charge which meets this standard would not be taken to mean that by introducing *alibi* evidence the defense assumed a burden of proof, which, if not met, could provide a basis for finding guilt.

***Saunders****, …* 602 A.2d at 818; ***see Commonwealth v. Jones****, …* 602 A.2d 820 ([Pa.] 1992) (quoting same language).

Thus, while a proper *alibi* instruction need not contain any "magic language," the charge must make it clear to the jury that *alibi* evidence, by itself or taken together with other evidence may tend to raise a reasonable doubt as to defendant's guilt. In short, the trial court must "make it clear to the jury that the defendant's failure to prove *alibi* is not tantamount to guilt." ***Commonwealth v. Weinder****, …* 577 A.2d 1364, 1370 ([Pa. Super.] 1990)[, *abrogated on other grounds by* **Commonwealth v. Hawkins**, 894 A.2d 716 (Pa. 2006)].

***Commonwealth v. Allison***, 622 A.2d 950, 952–53 (Pa. Super. 1993).

Here, the trial court gave the following *alibi* instruction.

In this case, the defendant has presented evidence of an *alibi*, meaning that he was not present at the scene or was rather at another location at the precise time that the crime took place. You should consider the *alibi* evidence along with all the other evidence in the case in determining whether the Commonwealth has met its burden of proving beyond reasonable doubt that a crime was committed and that the defendant himself committed it.

In assessing the credibility and weight of the *alibi* testimony, you should use the principles I just explained for assessing credibility and weight in general and specifically when there is conflicting evidence. The defendant's evidence that he

- 21 -

was not present, either by itself or together with other evidence, may be sufficient to raise a reasonable doubt of his guilt. If you have a reasonable doubt of the defendant's guilt, you must find him not guilty. On the other hand, if you are convinced beyond reasonable doubt that the defendant is guilty, you should find him guilty.

N.T., 6/29/2015, at 128–29.

Upon review, we conclude the trial court's instruction made it clear that "that *alibi* evidence, by itself or taken together with other evidence may tend to raise a reasonable doubt as to defendant's guilt." ***Allison***, 622 A.2d at 953 (citations and internal quotation marks omitted). Because the underlying claim is without merit, counsel cannot be deemed ineffective for failing to object to the *alibi* instruction. ***See Commonwealth v. Spotz***, 47 A.3d 63, 82 (Pa. 2012) (concluding there was no arguable merit to Spotz's ineffectiveness claim and that "counsel is not ineffective for failing to raise a meritless objection"). Accordingly, the PCRA court did not err in dismissing this claim.

**Failure to Object to Witness Credibility Opinion Testimony**

Next, Appellant claims that trial counsel was ineffective for failing to object to testimony that Malisha's brother, Aiking Jessie, did not believe Appellant's denial of involvement in the murder. Appellant's Brief at 37–38. Appellant argues that "a witness may not opine on whether another witness is truthful or deceptive, as credibility is the sole province of the jury." ***Id.*** at 38.

By way of background, it was Appellant's trial counsel who first asked Aiking about Appellant's denial of involvement in the murder.

Trial counsel: Mr. Jessie, you actually looked Rudy McGriff in the eye and asked him if he killed your sister, didn't you?

Aiking: I did.

Trial counsel: And he looked you in the eye back and told you that he did not and that he would never do that to your sister, didn't he?

Aiking: That's what he said.

N.T., 6/18/2015, at 181–82 (party designations added).

On redirect, the prosecutor immediately asked Aiking if he believed Appellant. Aiking responded that he did not. *Id.* at 182. When asked if Appellant were acting like he never would have done that or if he seemed to be hiding something, Aiking responded, "I believe he was acting." *Id.* Then, on recross, trial counsel highlighted that even though Aiking did not believe Appellant, he did not tell detectives, who arrived shortly thereafter, that Aiking thought Appellant had killed Malisha. *Id.* at 184–85.

Here, since Appellant never testified, his credibility was not at issue. *See Commonwealth v. Jones*, 683 A.2d 1181, 1195 (Pa. 1996). As to Aiking's testimony that he did not believe Appellant's denial, it was trial counsel who introduced Appellant's out-of-court statement to Aiking, wherein Appellant stated that he did not kill Malisha. In doing so, trial counsel emphasized that Appellant looked Aiking in the eye when Appellant

denied any role in the killing. The redirect examination challenged by Appellant in his PCRA petition constituted proper rebuttal to that line of questioning. Having concluded that the underlying claim is without merit, counsel cannot be deemed ineffective for failing to raise a meritless objection. **See Spotz, supra**. Accordingly, the PCRA court did not err in dismissing this claim.[7]

## Failure to Object to Closing Argument

Next, Appellant claims that trial counsel was ineffective for failing to object to the prosecutor's closing argument, which he alleges contained expressions of personal belief and attacks on counsel's trial strategy. Appellant's Brief at 39.

> In order to obtain relief for alleged prosecutorial "misconduct," a petitioner must first demonstrate that the prosecutor's action violated some statutorily or constitutionally protected right. Consistently, we have held that prosecutorial misconduct does not occur unless the prosecutor's challenged comments had the unavoidable effect of prejudicing the jury with such animus toward the defendant as to render it incapable of fairly weighing the evidence and arriving at a just verdict. A prosecutor does not engage in misconduct when his statements are based on the evidence or made with oratorical flair. Additionally, a prosecutor must be permitted to respond to arguments made by the defense.

---

[7] We observe that the PCRA court dismissed this claim because it found that Appellant failed to plead this claim within the context of the PCRA. PCRA Court Opinion, 5/12/2020, at 18–19. Appellant, however, raised this claim in the context of an ineffective assistance of counsel claim, which is cognizable under the PCRA. Regardless, we may affirm the decision of the PCRA court if there is any basis in the record to support its action. **See Commonwealth v. Wiley**, 966 A.2d 1153, 1157 (Pa. Super. 2009).

***Commonwealth v. Carson***, 913 A.2d 220, 236–37 (Pa. 2006) (citations omitted). When a prosecutor's closing argument constitutes a fair response to a defense argument or is based upon the evidence presented at trial, defense counsel has no obligation to object and a related claim of trial counsel effectiveness has no merit. ***See id.*** at 240.

Specifically, Appellant challenges counsel's failure to object to the following by the prosecutor: referring to the *alibi* as an "utter lie;" accusing trial counsel of employing "smoke and mirrors" in an attempt to "distract" the jury and get the jury to "forget the evidence;" referring to the defense as a "Phill[ie Ph]anatic defense;" and stating "[Appellant was] lying to them outright," "they're blaming [Johnson's] lies on Ramadan," "we know [Johnson] lied," "their concocted, lying *alibi*," "are you kidding me, are you kidding me," and "we know, and you all know, that it's a 100% lie." Appellant's Brief at 39 (citations omitted).

In dismissing this claim, the PCRA court concluded:

None of these statements rise to the level of prosecutorial misconduct. In his own closing statement, defense counsel argued that jurors should believe [Appellant's] *alibi* and he attacked the credibility of several witnesses. Since credibility was at issue, the prosecutor was permitted to argue specifically where he believed the evidence was consistent or inconsistent, particularly the incredible aspects of the *alibi*. Moreover, even if any of these comments were expressions of personal opinion or exceeded the bounds of oratorical flair, none rose to the level of prejudicing the jury so much so that they could not render a true verdict. Since [Appellant] cannot show that defense counsel's failure to object to these comments by the prosecutor satisfies the three ineffectiveness prongs, no relief is due.

PCRA Court Opinion, 5/12/2020, at 17–18.

Upon review, we agree with the PCRA court. The challenged statements, considered in context, fall within the parameters of fair response and oratorical flair. In his closing argument, trial counsel explained that the later part of Johnson's testimony, where "she got tired and she started to say, okay that's possible, okay that's possible, okay that's possible[,]" was due to the fact that she "had been awake since 3[:00] a.m. and hadn't eaten" because it was "her holy time of Ramadan this month[.]" N.T., 6/29/2015, at 36. It was a fair response for the prosecution to state, "How unbelievable is it that they're blaming her lies on Ramadan?" *Id.* at 88.

In discussing Gay-McGriff's *alibi*, trial counsel stated in his closing that "she's not a liar" and "[i]f she wanted to be a lying *alibi*, she would come and say that" Appellant was with her "between 2:20 and 2:40." *Id.* at 38–39. The prosecutor's references to a "lying *alibi*" and "lie of a defense" were in fair response to this argument.

In lambasting the detectives' explanations for why they did not conduct search warrants at any of Appellant's residences, trial counsel said, "you've got to be kidding me." *Id.* at 44. Later, when lambasting Gay-McGriff's *alibi*, the prosecution responded with a similar, "Are you kidding me?" *Id.* at 111-12.

Finally, in response to trial counsel's comments pertaining to Appellant's receipt of a life sentence if convicted, the prosecution's purported

deletion of evidence, and the prosecution's refusal to test the DNA of convicted criminals to exonerate them, the prosecution asked the jury not to be distracted by trial counsel's "smoking [*sic*] mirrors." *Id.* at 69. In responding to trial counsel's objectionable statements and lambasting of the prosecution, the prosecutor used a Phillie Phanatic[8] analogy to ask the jury not to be distracted.

> Don't be distracted by these smoking [*sic*] mirrors by the defense[]. This is nothing but him dancing the Phill[ie Ph]anatic across the dugout during the seventh-inning stretch to distract you from keeping your eye on the ball, to distract you from the game, from what's going on in front of you, from what's important, from the evidence. Because the evidence is airtight. And if you focus on the evidence, it leads to one conclusion, and they can't take that.

*Id.* The prosecutor employed this motif twice more in response to trial counsel's criticism of the detectives and reference to the movie "My Cousin Vinny"[9] in relation to Wallace's identification testimony.

> What they want to do is berate Detective Tolliver and say, you know, folks, you should all hate the police and you should be angry at the police; they didn't do their job. This man and his partner and his squad didn't do their job, so you should get angry at them. Let me just try and see if I can rile up emotions [in] jurors so that they can be so distracted and watch the Phill[ie Ph]anatic dance across the dugout so that they forget

---

[8] The Phillie Phanatic is the official mascot for the Philadelphia Phillies Major League Baseball team. He is a large, furry, green creature who performs during baseball games at Citizens Bank Park to entertain fans.

[9] "My Cousin Vinny" is a comedy movie that was released in 1992. In the movie, actor Joe Pesci plays Vinny, a nervous, unsuccessful, personal injury lawyer, who tries his first homicide case when his cousin and friend are wrongly charged with murder.

- 27 -

about the game that's in front of them, they forget about who's pitching and who's on third and who's on second and what the score is, that you completely forget about the evidence and just get your emotions up and say, you know what, I do hate the police, the police aren't doing their jobs.

\* \* \*

The defense attorney, you know, in his Phill[ie Ph]anatic defense, wants to talk about "My Cousin Vinny"? You know that cross-examination in "My Cousin Vinny"? It was a stranger identification, it was somebody they had never seen before. This is a known doer. He knows him. He knows him. He recognized him. It's a lot different when you see me walking down the street and you say, oh, I know that guy, he's the prosecutor. I recognize him because I've seen him before, because I've interacted with him, because I sat in the courtroom with him for two weeks, as opposed to someone you had never seen before, which was the situation in "My Cousin Vinny."

Apples and oranges. Don't be distracted.

*Id.* at 79–80, 102.

This Court has previously considered whether a prosecutor exceeded the permissible bounds of advocacy in employing this baseball analogy when commenting on a defense counsel's strategy.

[T]he prosecutor argued that the defense improperly urged the jury to look at one piece of evidence … rather than the totality of the evidence. Using a baseball analogy, the prosecutor contended that "looking at one word in the police documents is a Phill[ie] Phanatic dancing on that dug-out." In other words, one discrepancy should not distract the jury from the totality of the evidence, just as a baseball mascot can distract fans from the game. When viewed as a whole, and in the context of the defense's strategy, we find that the prosecutor did not exceed the bounds of advocacy[.] … Rather, the remark constitutes an appeal to the jury to use its collective intelligence and logic in assessing all of the evidence.

*Commonwealth v. Hennigan*, 753 A.2d 245, 261 (Pa. Super. 2000) (citations and some quotation marks omitted). As in *Hennigan*, we conclude that the Phillie Phanatic analogy was a fair response to counsel's closing argument and constituted permissible oratorical flair.

Considering the challenged statements in context, they did not have the "unavoidable effect of prejudicing the jury with such animus toward the defendant as to render it incapable of fairly weighing the evidence and arriving at a just verdict." *Carson*, 913 A.2d at 236. Because the underlying claim is without merit, counsel cannot be deemed ineffective for failing to raise a meritless objection. *See Spotz, supra*. Thus, the PCRA court did not err in dismissing this claim.

Moreover, the failure to object to a closing argument does not prejudice a defendant or amount to counsel ineffectiveness where the trial court properly instructs a jury that closing arguments are not evidence, that the jury is the sole judge of facts to be determined by the evidence, and that the Commonwealth has the burden of proving its case beyond a reasonable doubt. *See Commonwealth v. Jones*, 811 A.2d 1057, 1063 (Pa. Super. 2002). Here, the trial court gave the jury those instructions. *See* N.T., 6/29/2015, at 18–20, 121–25. "[J]urors are presumed to follow the court's instructions." *Commonwealth v. Aikens*, 168 A.3d 137, 143 (Pa. 2017). For this additional reason, Appellant's claim that counsel was ineffective for failing to object to the Commonwealth's closing argument fails.

**Evidentiary Hearing**

Additionally, Appellant argues that he is entitled to an evidentiary hearing on his individual claims. Appellant's Brief at 26, 29, 36, 39, 43, 46. We have previously determined:

> There is no absolute right to an evidentiary hearing on a PCRA petition, and if the PCRA court can determine from the record that no genuine issues of material fact exist, then a hearing is not necessary. With respect to the PCRA court's decision to deny a request for an evidentiary hearing, or to hold a limited evidentiary hearing, such a decision is within the discretion of the PCRA court and will not be overturned absent an abuse of discretion.

***Commonwealth v. McGarry***, 172 A.3d 60, 70 (Pa. Super. 2017) (internal citations and quotations omitted). Having determined that there was no merit to Appellant's contentions, we discern no abuse of discretion by the PCRA court in denying an evidentiary hearing.

**Cumulative Prejudice**

Finally, Appellant claims that he is entitled to relief because of the cumulative prejudice of the above-mentioned claims. Appellant's Brief at 46–49. According to Appellant, his claims "overlap as all affected the credibility determination" and "the cumulative impact is profound as the case was largely circumstantial." ***Id.*** at 47. Pursuant to Pennsylvania precedent, to the extent a petitioner's claims of ineffective assistance are rejected for lack of arguable merit, there is no basis for an accumulation claim. ***See Commonwealth v. Stevens***, 739 A.2d 507, 530 (Pa. 1999). However, when the failure of individual claims is grounded in lack of prejudice, then

the cumulative prejudice from those individual claims may properly be assessed. ***Commonwealth v. Hutchinson***, 25 A.3d 277, 318–19 (Pa. 2011). Instantly, only a portion of one of Appellant's claims, regarding counsel's failure to object to the lack of a limiting instruction for the threats evidence, failed under the prejudice prong. The remainder of that claim failed under the arguable merit prong. Appellant's claim that counsel was ineffective for failing to investigate Wallace's viewpoint failed under the reasonable basis prong. Appellant's remaining ineffective assistance of counsel claims failed under the arguable merit prong. Accordingly, his accumulation claim fails.

Order affirmed.

Judge Strassburger did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/13/2021